**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**TYREE R. WEBB,**

**Plaintiff,**

**v.**

**TECO BARGE LINE, INC.,**

**Defendant.**                                        **No. 07-514-DRH**

<u>**ORDER FOLLOWING BENCH TRIAL**</u>

**HERNDON, Chief Judge:**

> Somewhere deep inside their hearts and minds,
> there was a hope that the storm would not be bad.
> Especially for those that had no means to get out.
> But when she came with all her haste and wild destructive force,
> they realized then, they had become her main course!
> Devastation hung on the city with no reprieve.
> The winds were rampant as the waters gave heave.
> In the distance, cries rung out
> and suddenly there was no way out!
> No more time to plan or thinking to do.
> Just pick up the pieces and start life anew.
> Some were left bitter, some were bold.
> Only the future holds the answers yet untold.
> Some will learn from nature's lesson at last!
> Some blame God and other's blame Bush.
> But, who's really to blame when Katrina came?
> Yet still, it is a voice in our history just the same![1]

---

[1] Cynthia Martin, *Who is Really to Blame: A Poem About Hurricane Katrina* (Dec. 21, 2007), *available at* http://www.associatedcontent.com/article/498355/who_is_really_to_blame_a_poem _about.html (last visited Nov. 4, 2011).

Plaintiff Tyree Webb brought this action against his employer, defendant TECO Barge Line, Inc., pursuant to the Merchant Marine Act of 1920 ("the Jones Act"), 46 U.S.C. § 30104, and General Maritime Law.  Plaintiff designated this matter as an admiralty or maritime case under Federal Rule of Civil Procedure 9(h) and the Court heard this matter as a bench trial on September 6, 2011, and September 13, 2011.  For the reasons that follow, the Court finds that plaintiff Webb suffered total damages, including prejudgment interest for his past damages, in the amount of $4,293,271.56 as a direct result of Hurricane Katrina and defendant's negligence.

## I.     Undisputed Facts[1]

### A. The Pleadings And Defendant's Opening Statement Establish the Following Undisputed Facts

1.     On August 24, 2005, Tropical Depression 12 strengthened into Hurricane Katrina and a hurricane warning was issued for the southeastern Florida coast.  On August 25, 2005, Hurricane Katrina struck Florida and caused the deaths of at least nine persons before moving into the Gulf of Mexico.  On August 26, 2005, in anticipation of Hurricane Katrina striking the Louisiana coast, Louisiana Governor Kathleen Blanco declared a state of emergency.  At approximately 4:00 p.m., on August 26, 2005, the National Weather Service issued a prediction of a 45% chance of a category 4 or 5 hurricane striking the United States Gulf Coast region including the area

---

[1] All findings of fact recited in this order were relied upon by this Court in each of its ultimate findings, including damages.  It is the intent of the Court that the order be considered as a whole, each section dependent on the other.

near Davant, Louisiana where the *M/V Anita M* and the *M/V Ann Peters*
were moored. At approximately 5:00 p.m., New Orleans Mayor Ray Nagin
and Mississippi Governor Haley Barbour both declared a state of
emergency. On August 27, 2005, at approximately 5:00 a.m., a hurricane
warning was issued for Louisiana's southeastern coast and for the
northern Gulf Coast.  At this time Katrina was a category 3 hurricane with
winds in excess of 115 miles per hour.  Later on August 27, 2005, National
Hurricane Director Max Mayfield called New Orleans Mayor Nagin to
advise a mandatory evacuation.  At approximately 7:00 a.m. on August 28,
2005, Hurricane Katrina became a category 5 hurricane with winds in
excess of 160 miles per hour.  At 11:00 a.m., Mayor Nagin ordered a
mandatory evacuation of New Orleans and President Bush declared a state
of emergency in Mississippi, Florida, and Alabama.  On August 29, 2005,
Hurricane Katrina struck the New Orleans area as a category 4 storm with
145 mile per hour winds. (Second Amended Complaint, par. 3, admitted
by Amended Answer, par. 3).

2.     On August 29, 2005, plaintiff Tyree M. Webb worked as the chief engineer
on board the *M/V Ann Peters*.  The *M/V Ann Peters* was at that time on the
Mississippi River at approximately mile 55.0 near Davant, Louisiana, near
another vessel, the *M/V Anita M* which was also owned, controlled, and/or
operated by defendant.  Plaintiff Tyree Webb was ordered by defendant to
transfer to the *M/V Anita M* at approximately mile 55.0 on the Mississippi

River near Davant, Louisiana, mere hours before the vessel was struck by

Hurricane Katrina, a category 4 hurricane with winds in excess of 145

miles per hour.  The *M/V Anita M* is an inland river towboat,

approximately 170 feet long by 45 feet wide, with diesel engines developing

a maximum of approximately 6,800 horsepower.  The *M/V Anita M* was

not designed, equipped, or intended to protect crew members from the

force of a hurricane.  (Second Amended Complaint, par. 4, admitted by

Amended Answer, par. 4).

3. Around the time of Hurricane Katrina, the *M/V Ann Peters* was used for

"fleet work," meaning moving barges around and building tows.  (Chris Lee

Deposition, p. 10).

4. Although defendant's company policy required the vessel Master or Pilot

on watch to take action to ensure the safety of crew members and although

defendant had previously ordered evacuation of its vessels when a

hurricane was imminent, defendant's officers, agents, servants, or

employees ordered the vessel and its crew, including plaintiff, to remain in

the Davant, Louisiana area for the duration of the hurricane.  The crew,

including plaintiff, obeyed this order, and remained on board the *M/V Ann*

*Peters* or the *M/V Anita M* for approximately the next three days.  During

that time, the hurricane battered the vessel for at least eight hours and

caused significant damage that required, among other things, emergency

pumps to be set up in order to avoid sinking of the vessel.  Immediately

before the storm struck, the *M/V Anita M* and the *M/V Ann Peters* were moored near the eastern bank of the Mississippi River. During the course of the hurricane, the vessels broke loose from their moorings and were driven by the hurricane onto the land on the opposite bank of the river, approximately one-quarter of a mile upriver and approximately one-half mile west from where they had originally been moored. After running aground neither vessel could move and the *M/V Anita M* was battered by numerous barges and other objects during the remainder of the storm. The day after the storm finally abated, defendant transported plaintiff Webb by vehicle to defendant's operations office in Metropolis, Illinois where he received counseling through defendant's employee assistance program, instead of transporting him to a psychiatric facility with licensed personnel. (Second Amended Complaint, par. 5, admitted by Amended Answer, par. 5).

5.   Boats operated by Ingram Barge Line and defendant's sister company, TECO Bulk Terminal, had evacuated in advance of the storm. (Deposition Ray Franklin, pp. 88-91). Defendant TECO Barge Line, Inc. decided that the *M/V Ann Peters* and the *M/V Anita M*, along with the crews of both vessels, would remain at mile 55 of the Mississippi River, approximately 50 miles downriver from New Orleans. (Ray Franklin Deposition, pp. 74-75).

## II. ADDITIONAL FINDINGS OF FACT

### A. Defendant Ordered the *M/V Anita M* and the *M/V Ann Peters* Employees To Remain At Mile 55 as Anchors to the Eighty Barge Flotilla that was in Place While Sending Terminal Employees Out of Harm's Way

6.      Defendant's amended answer does not contend nor does its evidence suggest that if defendant had ordered its employees to evacuate from the Davant, Louisiana area, the crew members would still have been exposed to a storm of life-threatening proportions.  The testimony of the vice-president of TECO Bulk Services, Inc., Rod Palmer, established that the TECO Bulk Terminal boats departed from the bulk terminal near Davant - the same place that the *M/V Anita M* and the *M/V Ann Peters* stayed - before the hurricane and made it "almost up to Baton Rouge."  (Rod Palmer Deposition, pp. 37-38).  Every one of the Bulk Terminal employees was "okay."  *Id.* The *M/V Anita M* arrived at mile 55 at approximately 1400 hours on August 27, 2005, and for the remaining ten hours of that day assisted the *M/V Ann Peters* to "secure fleets in preparation for Hurricane Katrina." (Plaintiff's Exhibit 3).  This work continued from 0001 hours until 1900 hours on August 28, 2005.  (Plaintiff's Exhibit 4).

7.      Ray Franklin was captain of the *M/V Ann Peters.*  Captain Franklin described building the hurricane tow as making "a little fort out of these barges".  (Ray Franklin Deposition, p. 72).  Franklin described the gap as

a "duck pond" in the middle. *Id.[2]* Franklin explained that barge 703B

"MTY" was positioned behind and perpendicular to the two boats, "[j]ust

like shutting a door." *Id.* This configuration is illustrated in Plaintiff's

Exhibit 9:



8. The stress that the crews of both boats were under as the hurricane

approached is clear and is illustrated in Ray Franklin's video deposition.

---

[2] Of course, as one can readily see in Exhibit 9, the "duck pond" is nowhere near the middle but is in the bottom line of barges – causing this Court to characterize the two towboats as the "anchor" of the flotillas.

Although Captain Franklin gave his testimony almost four years after the hurricane, when he described positioning the final barge in the barge fort, Captain Franklin - a twenty-nine-year veteran licensed towboat captain in command of the *M/V Ann Peters* - broke down and could not continue his testimony.  See Ray Franklin Deposition at pp. 72-73; video deposition at 15:37:29-15:37:58.

9. The crew of the *M/V Ann Peters* evacuated that vessel in favor of the larger *M/V Anita M* a few hours before the storm.  (Exhibit 6, Log of the *Ann Peters* August 28, 2005; Robert Keller Deposition, p. 34-35; Chris Lee Deposition, p. 14-15).  The log of the *M/V Ann Peters* reflects that at 2230 hours the crew of that boat "boarded M/V *Anita M* due to the severity off [*sic*] Hurricane Katrina (unsafe to stay on *Ann Peters*)."  (Exhibit 6, Log of the *Ann Peters* August 28, 2005).

10.     The log of the *M/V Ann Peters* for Monday, August 29, 2005, indicates that at 0430 hours the crew was riding out Hurricane Katrina. (Exhibit 11, Log of the *Ann Peters* for August 29, 2005).  The log further indicates that at some time between 1410 and 1200 the barge fleet broke away and the "boat broke out of tow, grounded mile 55, take on water from wind swells from Hurricane Katrina." (*Id.*).

11.     Before the storm, the barges were secured tightly to each other and the boats were secured tightly to the barge tow. (Chris Lee Deposition, p. 44).  Despite that, the violence of the storm caused the barge fleet to break away during the hurricane.  (Plaintiff's Exhibit 6, Handwritten log of *Ann Peters;* Ray

Franklin Deposition, pp. 93-94; Chris Lee Deposition, p. 44). The pilot of the *Ann Peters,* Jerry Wayne Crockerell,[3] characterized this as "the big punch," "the mother of all storms." (Crockerell Deposition, p. 62). James Grubb, Captain of the *M/V Anita M,* testified that the boat was running full speed ahead right before it landed on the opposite bank. (Grubb Deposition, pp. 81-82). This was to "keep it from running back upstream." (*Id.* at 80). The storm surge was what was pushing the vessels upstream. (*Id.*).

12.     The vessels started off moored just downriver from the coal dock on the eastern bank of the river and ended up on the levee on the western bank of the river, about a quarter mile upriver from where they had started. (Chris Lee Deposition, pp. 42-43; Johnson Deposition, p. 63). The boats quickly crossed the river with winds in excess of 100 miles per hour propelling it. (Grubb Deposition, pp. 82-83).

### B.  Hurricane Katrina Strikes Davant, Louisiana

13.     At the beginning of the storm, the vessels were facing upriver. (Chris Lee Deposition, p. 42). Both vessels eventually came to rest on the opposite, or west bank, facing 180 degrees opposite from the way they had started. (Trial Testimony, William Love, Day 1, Vol. I, pp. 39-41; Trial Testimony, Vogene Couch, Day 1, Vol. I, p. 184; Chris Lee Deposition, pp. 43-44; and see Exhibits 9,16 and 25).

---

[3] Mr. Crockerell died during the litigation and his administrator and widow was substituted as plaintiff in his stead. The case on behalf of the Crockerell Estate settled prior to trial.

14.    Once the storm began, the boat began rocking.  (Chris Lee Deposition, p. 41).  The steel cables securing the fleet broke, and the breaking of these cables sounded like gunshots.  (James Grubb Deposition, pp. 70-71).  The *M/V Anita M* and the *M/V Ann Peters* crashed into each other during the storm after the vessels got across the river.  (James Grubb Deposition, pp. 71-72).  The crew could hear the rigging break.  (Chris Lee Deposition, p. 45).  The face wires - heavy metal cables secured to winches on the head deck of the boat - snapped during the storm.  (Johnson Deposition, p. 36-37).

15.    The log for the *M/V Ann Peters* for August 29, 2005, indicates that at 1100 hours, the crew of that boat was still on the *M/V Anita M* and that the storm had caused "major damage to *Ann Peters.*"  (Exhibit 11.).

16.    William Sandage was the pilot on the *M/V Anita M.*  He has been a licensed river pilot since 1974.  (Sandage Deposition, p. 4).  Sandage was "between the sticks," or operating the vessel at the time the tow broke loose.  (*Id.* at 53).  Sandage explained that the *Anita M* had a "swing meter."  (*Id.* at 53-54).  "The swing meter tells you the -- when you are actually moving, the tow is moving.  And it's just fluctuating, you know, as long as you're tied off.  But when it -- when it (gesturing) -- I knew it was just gone."  (*Id.* at 54).  The indicator on the swing meter told Sandage that "your stern was going around and your head was coming down" and that "[e]verything is going to the starboard."  (*Id.*).  The meter was telling Sandage that the boat was spinning around and at that point,

he knew he was in danger of colliding with all the barges. (*Id.*). Sandage

testified that this was "really frightening." (*Id.* at 55).

17.     Sandage "started taking evasive maneuvers . . . ." (*Id.* at 53).  He "[s]tarted

driving the boat like I normally do, trying to make adjustments and corrections,

you know, trying to pull the head down and get the tow flat because we're going

to hit on the other side of the river.  So I got the towboat down.  It -- it landed

flat.  Everything landed flat.  Boats landed flat.  The wind caught the tow.  The

boats were on the ground.  And everything -- all of the face rigging went and the

barges went away.  But we were left over on the west bank." (*Id.* at 55).

18.     When the vessel landed on the bank "we hit the trees.  I mean, it flattened

out -- the tow flattened out the trees." (*Id.*).  "[A]ctually the worst of it was all of

the wave action;  you know, once -- once the barges were away from you, you

know, nothing to stabilize you" and because you were no longer secured, you

were bouncing around even more.  (*Id.* at 55-56).

19.     All of the crew members expressed concern about remaining on the vessel

in Davant during a hurricane.  (Robert Keller Deposition, p. 33).  Numerous

crew members testified that they feared for their lives during the hurricane.

(Tyree Webb Trial Testimony, Day 1,Vol. I, pp. 80-81; William Love Trial

Testimony, Day 1,Vol. I, p. 36; Wayne Crockarell Deposition, pp. 74-75; Ray

Franklin Deposition, p. 70; Tim Powell Deposition, pp. 17-18).  The following

colloquy between Captain Franklin and plaintiff's counsel during Franklin's

deposition illustrates his feelings surrounding the situation:

Q. When you were actually in the wheelhouse of the ANITA M, Captain, were there occasions when you were afraid that the storm might take your life or the lives of the other crew?

A. Yes. Yes. Yes.

Q. All right. And how long did that go on --

A. Oh, hours.

Q. -- when you had those thoughts?

A. Yes. You didn't know. I mean, unless you was there, you didn't know.

(Ray Franklin Deposition, p. 68).

20.    Some members of the crew began feeling anxious as soon as they found out they were staying for the hurricane. (Wayne Crockarell Deposition, pp. 100-01). "It just kept getting worse every minute." (*Id.* at 101). The growing anxiety was exacerbated by the behavior of the company vice-president, David O'Neill, who violated an industry safety policy[4] by jumping into the river to "swim" a line to a mooring structure. (William Sandage Deposition, pp. 35-40; Richard Johnson Deposition, pp. 32-33). TECO had adopted "The Deckhand's Manual" which includes a set of safety rules that are "pretty universal" in the industry. (Sandage Deposition, p. 38-39; and see Plaintiff's Exhibit 21). Rule 18 states: "Do not jump into the river to swim a line ashore. Use the yawl. Swimming off the boat or barges is prohibited." (Sandage Deposition, p. 39). O'Neill's conduct violated this basic safety rule. (*Id.*; Tyree Webb Trial Testimony, Day 1, Vol. I, p. 69). In doing so, Mr. O'Neill caused the crew to question his judgment and whether he was making rational decisions for their safety. (Tyree Webb Trial Testimony, Day 1, Vol. I, p. 70).

---

[4] As well as common sense for the area is infested with alligators. See Ray Franklin Deposition, p. 57. "We're not at the top of the food chain down here." *Id.*

21.    O'Neill, acknowledged that his tactic was in violation of the company rules. (David O'Neill Deposition, p. 68).  In ordinary circumstances and times he would not condone his actions for himself or rank and file employees.  (*Id.* at 71).  His assertion, however, is that an emergency situation excused a rule violation and this circumstance justified it.  (*Id.*)  Part of O'Neill's rationale is that had he used a skiff it would have been demolished in the rough conditions of the river at the time.  (*Id.* at 68-71).  In other words, if the line was going to get to the place it needed to be, someone had to swim it there and he was not going to ask an employee to perform such a dangerous task.  (*Id.* at 70-71). The Court's finding that O'Neill's action caused employees to question his overall judgment supports much of plaintiff's theory in this case.  Rather than knowing O'Neill's rationale, if in fact he is telling the truth in his deposition, the employees at the scene simply believed it was just one more chaotic act in an altogether crazy, violent, chaotic day that they wanted no part of, but were being forced to participate in.  Of course, that a vice-president of the company was motivated to violate so fundamental a safety rule as this, gives light to the violent nature of the river conditions even prior to the time the hurricane actually hit the defendant's boats and crew which were caused to ride out the treacherous conditions.

22.    Every crew member of the *M/V Ann Peters* except for the captain filled out an accident report following the storm.  (Grubb Deposition, pp 89-90).

23.     The log for the *M/V Ann Peters* for Monday, August 29, 2005, indicates that the *M/V Anita M* was taking "on water from wind swells from Hurricane Katrina." (Exhibit 11).

24.     During the storm the crew lounge door buckled and water poured into the lounge area. (Robert Keller Deposition, p. 37-38). Before the storm, the door was not damaged in any way. (Chris Lee Deposition, p. 17). The force of the water burst the door open. (*Id.* at 16). When the door burst open "[i]t sounded like somebody hit the door with a sledge hammer." (Keller Deposition, p. 38). Despite running the pumps for half an hour, the crew failed to make headway against the incoming water. Two crew members observed a foot of water in the crew lounge, despite the operation of two two-inch pumps. (Richard Johnson Deposition, pp. 34-35; Robert Keller Deposition, p. 38). Robert Keller testified that he held the door shut until he could get some help. (Keller Deposition, p. 37). Finally, someone took a "sludgehammer" and "beat the biggest part of the door back in." (Crockarell Deposition, pp. 88-89; Sandage Deposition, p. 60). Someone shoved a medicine cabinet against the door to keep it from coming open again. (Grubb deposition, pp. 73-74; Richard Johnson Deposition, pp. 35-36). One of the lounge windows was also blown out and had to be replaced with plywood. (Johnson Deposition, p. 36).

25.     Because of the water coming through the door, defendant's employees had to deploy pumps. (Richard Johnson Deposition, pp. 34-35; Chris Lee Deposition, p. 17). Crockarell described the frantic pumping in the crew

lounge on the main deck, stating, "And we probably pumped her about 30 minutes to gain water, because when we first started them, we wasn't gaining much, but after Lindell, I'm saying it was him, you know, beat them back in pretty close, it's -- you know, we started gaining, then we had to pump out deck crew quarters and all back down through there." (Crockarell Deposition, p 89). Lee characterized this as a "stressful" time. (Lee Deposition, p. 17). Deckhand Lynn White was wearing more than one life jacket and a life ring. (*Id.* at 19). White expressed concern to Lee about whether or not "he was going to make it." (*Id.*).

26.     Tim Powell was the chief engineer on the *M/V Anita M.* (Powell Deposition, pp. 5-6). Powell testified that the lounge door blew open and a lounge window "tried to come out and we managed to get it wedged back in there." (*Id.* at 7). Powell became aware of the problem when "they opened the door and run a pump hose into the engine room so it could get down there to the pumps. I said what in the world is going on there?" (*Id.* at 8). Powell testified that when the lounge door blew open, it "flooded the lounge." (*Id.* at 7). This was stressful because "for about three hours we was in a dead run trying to get water out." (*Id.* at 9). Powell and the assistant engineer, Jeff Chambers, expressed concern to each other about whether they were going to make it through the hurricane. "It was a serious time." (*Id.* at 16). "Several of us called home and told our families good-bye because we didn't think we would see them again." (*Id.* at 17). Powell was one of the people who made such a call.

(*Id.*).  Powell was in fear of his life and for the lives of the people who depended on him to do his job, for an extended period of time during the storm.  (*Id.* at 18).

27.    Although both boats were grounded, the water was so high during the storm that the crew could not tell that they were aground.  (Crockarell Deposition, pp. 72-73). Although the boat was grounded, Webb knew it was still in the water "[b]ecause the watering tanks for the cooling systems are on the bottom of the boat.  You get the water below the bottom of the boat, you don't have anywhere to run your air conditioning systems."   So the boat still had power but no longer moved. (Tyree Webb Trial Testimony, Day 1, Vol. 1, p. 77). Captain Grubb had to engage the engines "a time or two" to make sure the boat stayed on the bank.  (Grubb Deposition, p. 81).  During this time, the boats had no maneuverability.  (Franklin Deposition, p. 80).

28.    The sole witness offered by TECO Barge Line, Inc. to support its theory that the storm was not appropriately perceived as life-threatening was Vogene Crouch, the cook on board the *M/V Anita M.*  Her testimony in this regard was simply a fabrication, an act of perjury, that one can only infer was perpetrated to curry favor with defendant.  She is still employed by defendant and has reason to lie on behalf of her employer.  Ms. Crouch seemed blissfully unaware that the *M/V Anita M* had been tossed by hurricane force winds, twenty-six foot waves, spun at least 180 degrees around, and had been in danger of flooding. Her testimony did not square with the other witnesses' observations, or frankly

with common sense.  The essence of her testimony was that this experience was not much different than another trip on the river in non-hurricane conditions. Her testimony was a blatant lie and the Court is shocked that defendant would even bother to tender such obvious false testimony.  Her credibility was no better when it came to her revised memory of the persons discussing a potential lawsuit.  Defendant's trial counsel elicited testimony from this witness about plaintiff discussing a future lawsuit.  The witness was thoroughly impeached on her testimony about who discussed what about future lawsuits.  Regardless, the Court finds that in the midst of this chaotic scene, anger about being forced to ride out a hurricane would abound with banter about exercising one's access to the courts.  Who wouldn't be having such a discussion under those circumstances?  The Court hardly thinks everyone would be sitting around heaping praise on defendant for the joy ride.  The relevant issue is whether one has suffered injury, which a fact finder must decide.

29.     The storm surge "took all the barges upriver." (Sandage Deposition, p. 59). "When you get on the other side of the hurricane, the wind changed directions, tide went back out, the surge went back out and here all of the barges come back down the river." (*Id.*).  This was not just those barges that had been in the *M/V Anita M's* tow, but "[a] lot of other barges."  (*Id.*).

30.     Once the *M/V Anita M* and the *M/V Ann Peters* broke free from their rigging, the situation became even more chaotic.  Barges began coming back down the river after the storm surge subsided.  "[E]verything that went north

come south.  Then -- you know, then you are in that -- them empty barges, you know, could very well hit us."  (William Sandage Deposition, p. 56).  Barges were everywhere, "going down the river, upside down, sticking straight up." (Richard Johnson Deposition, pp. 61-62).  After coming to rest on the other side of the levee, the *M/V Anita M* was struck by barges coming back down river.  (Johnson Deposition, pp. 60-61; Sandage Deposition, pp. 59).  All of the barges from upstream were coming downstream.  (Johnson Deposition p.63). At least two of the barges damaged the vessel, with a "crushing steel to steel" sound.  (Johnson Deposition, p. 61; Sandage Deposition, p. 60 ("I think three times" barges struck the *M/V Anita M*)).  The *M/V Ann Peters* and the *M/V Anita M* struck each other until the water level started falling.  (Johnson Deposition, p. 62).  This motion was like a see-saw; when one would go up, the other would go down, scraping against each other each cycle. (Sandage Deposition, p. 56-57).  This occurred constantly through the course of the storm.  (*Id.*).  "The port corner of the rudder room was crushed in from where an empty landed on us. Had a nick out of the second deck -- or what do you call it, the --around the side, the rail around the side had a nick out of it where an empty had hit up there on the second deck."  (Tim Powell Deposition, p. 7).

31.     The hurricane lasted approximately fourteen hours. (Sandage Deposition, p. 65-55).

### 1. Plaintiff Webb's Experience in Hurricane Katrina

32.     Tyree Webb is the plaintiff in this matter.  In the days leading up to Hurricane Katrina, Webb was the chief engineer on the *M/V Ann Peters*;  there was no assistant engineer, so Webb was the only crew member assigned to the engine room.  (Tyree Webb Trial Testimony, Day 1, Vol. 1, p. 64).  Webb worked a straight twelve-hour shift, from 5 a.m. to 5 p.m., but if something went wrong or needed attention after his watch ended, Webb would take care of it.  (*Id.*).  There was no evidence that he had any physical or emotional difficulty doing so or that defendant took umbrage with his work.  In August of 2005, the *M/V Ann Peters* worked as a harbor tug with seven crew members: a captain, pilot, engineer, first mate, second mate, and two deckhands.  (*Id.* at 65).  Webb heard that there was going to be a hurricane the week before it actually struck and expected that the boat would evacuate the area.  (*Id.*).  Webb noticed that other vessels had left and wondered when his boat would get the order to go north.  (*Id.* at 66).

Webb agreed with William Love's testimony concerning the building of the barge fort.  (*Id.* at 70).  The barges were tied off to moorings and the boats were faced up to the barges.  (*Id.* at 71).  "Faced up" means that the face lines or cables connect the boat to the barge.  (*Id.*).  The barges have deck fittings that are designed to allow the face wires to wrap around and hold them to the boat.  (*Id.*).  The face wires run from winches on the boat that pull them tight.  (*Id.*).  The face wires are one inch thick steel cables.  (*Id.*).

The cables that are used to wire the barges together are similar construction. (*Id.* at 72). The two boats were also connected with lines. (*Id.*). David O'Neill and Lindell Werner came down from the office in Metropolis to Davant late Saturday or early Sunday morning. (*Id.* at 66). O'Neill called the crew into the galley and told them that they would be staying and to get ready for the hurricane. (*Id.* at 66-67). Webb began feeling apprehensive when he heard O'Neill's decision. (*Id.* at 67). His apprehension grew when O'Neill violated an industry safety rule - and common sense - by jumping into the river with a line. (*Id.* at 68-70). Davant is about 50 river miles south of New Orleans and the river is infested with alligators, snakes, and other dangerous creatures. (*Id.* at 67). This foolhardy behavior caused Webb's apprehension to increase because O'Neill was the one deciding whether they would exit or stay. (*Id.* at 70). As events unfolded, Webb's apprehension increased. (*Id.*).

Around 10:30 or 11:00 p.m., O'Neill ordered the *M/V Ann Peters'* crew to evacuate and transfer to the *M/V Anita M*, which again increased Webb's anxiety. (*Id.* at 72). The *M/V Ann Peters'* crew went to the lounge and galley area on the *M/V Anita M*. (*Id.*). Some crew members like William Love went to the deck locker at times but nobody went outside onto the exterior deck of the vessel to watch the storm. (*Id.* at 73). Around midnight, the wind had "started to get up and it started to rain." (*Id.*) "It progressively got worse until the hurricane got there." (*Id.*). Around 4:00 a.m., the "winds got severely heavy. Tidal surge came in, broke the boat loose from the moorings." (*Id.* at 73-74). Things were not

quiet; Webb could hear the wind and rain and could hear wires snapping.  (*Id.* at 74).  Webb could hear and see the wires snapping.  (*Id.*).  The tow and the barges eventually broke loose.  (*Id.*)  Before the storm started, the boat was facing northbound at approximately mile 54 or 53.  (*Id.* at 75).  Webb agreed with Love's testimony concerning the satellite photo that Love had described.  (*Id.*).  After the storm, the boats were about a mile up river from their starting point and all the way across the river, which is approximately a mile wide at that point.  (*Id.*).  Webb was aware of being in motion after the tow broke up.  (*Id.* at 75-76).  He could feel the boat rocking and bumping against the barges.  (*Id.* at 76).  Webb realized the boat was no longer moving when it was on the west bank facing south.  (*Id.* at 77).   During this time "we got tapped by some barges pretty good." (*Id.* at 77-78).  Webb did not know how many times the *M/V Anita M* was struck by barges.  (*Id.* at 78).  Webb did see "more than a hundred" barges coming back downriver; some of them actually struck the boat.  That made Webb feel "pretty scared at the time."  (*Id.*).

At one point during the hurricane, Webb was standing in the doorway between the lounge and the galley when the starboard lounge door broke in.  (*Id.* at 78).  When that happened, water "flooded the room immediately."  (*Id.* at 79). The crew had a difficult time keeping up with the water coming into the boat. (*Id.*).  Water continued to pour in and "every time the wave would hit the boat, a bunch would pour in."  (*Id.*).  Webb helped the rest of the crew set up two two-inch intake, two-inch outgoing pumps and ran the outgoing hoses overboard.  (*Id.*).

Because of the water coming into the boat, the crew had to drill holes in the upper deck and galley to let them drain because "[t]here wasn't any other way to get the water out." (*Id.* at 79-80).  The engine room has bilge pumps and the purpose of drilling the holes was to get the water down to the bilges where it could be pumped out.  (*Id.* at 80).  During this time, Webb was afraid for his life.  (*Id.*).  This intense fear lasted until the hurricane was over, around 11:00 a.m.  (*Id.* at 80-81).  During this time, Webb feared that he and the other crew members would be dying on the boat.  (*Id.* at 81).

**2.  Webb and Other Crew Members are Evacuated After the Hurricane**

33.    Webb filled out an accident report.  He explained that many of the pre-printed boxes on the report form did not apply to his situation.  (*Id.* at 82-83). Webb did fill out the box labeled "Description" by saying "Possible stress factor complications (unknown at this time)."  (*Id.* at 83).  Webb believed that this description was accurate.  (*Id.*).  Both Webb and the captain, Ray Franklin, signed the report.  (*Id.* at 83-84).  Eventually, Webb was evacuated by helicopter to Houma, Louisiana, where a crew van was waiting to take him back to Metropolis, Illinois.  (*Id.* at 84).  Webb did not choose that destination.  (*Id.* at 85).  When he arrived in Metropolis, he was unable to go home right away but instead had to wait for about an hour for a psychiatrist to get there.  (*Id.*)  Webb was then instructed to report to a meeting room where the psychiatrist "had us all sit in a semi-circle and started asking us what our story was and what happened to you and things of that nature."  (*Id.*)  This only made Webb feel

worse.  (*Id.*).  Webb was angry because he felt the psychiatrist was "very unprofessional, the way she did.  It was like it was entertainment."  (*Id.* at 85-86).  During the session, William Love and Webb both got up and walked out.  (*Id.* at 86).

Webb rode home for about an hour and a half to two hours with his wife. (*Id.* at 86).  When he got home, Webb broke down and cried a while and went to bed.  (*Id.*).  After his breakdown, Webb felt different than he had before he got on the boat on that trip and decided to see a doctor.  (*Id.* at 86-87).  He went to Dr. Lee who gave him Valium and recommended he see a psychiatrist.  (*Id.* at 87). TECO's Employee Assistance Program recommended that Webb see Centerstone Clinic in Clarksville, Tennessee.  (*Id.*).  At this time, Dr. McGhee was working at Centerstone and undertook to care for Webb.  (*Id.* at 88).

34.    After considering the pleadings, including defendant's admission of liability, and all of the evidence, including the facts found above, the Court finds that defendant TECO Barge Line, Inc. was negligent in failing to evacuate the crews of the *M/V Ann Peters* and the *M/V Anita M.*  The Court also finds that the *M/V Ann Peters* and the *M/V Anita M* were unseaworthy in that they were not reasonably fit to withstand the hurricane to which defendant chose to expose them.  The Court finds that the hurricane posed a very real threat to the lives of the crew members, including plaintiff, whom defendant ordered to remain at Mile 55 on the Mississippi River.  The Court further finds that had defendant ordered the *M/V Ann Peters* and the *M/V Anita M* to evacuate at the time that

defendant's vice-president, O'Neill, departed Metropolis, Illinois for Davant, Louisiana, the vessels would have reached a place of relative safety such that the storm would not have been a life-threatening event.  The Court therefore concludes that the decision of defendant TECO Barge Lines, Inc. to require its employees to remain at Mile 55 during Hurricane Katrina was the legal cause and a substantial contributing cause of plaintiff's injuries and damages.

### C. Injuries Caused by Defendant's Failure to Evacuate the *M/V Ann Peters*

35.    Tyree Webb was the chief engineer on board the *Ann Peters.*  Before the hurricane, as noted in part in the facts above, plaintiff Webb did not have any physical or mental disability that interfered with his ability to perform his job. (Ray Franklin Deposition, p. 64; Harry Chambers Deposition, pp. 32-33). Captain Franklin testified that during the year that he worked with plaintiff, he had never had any issues with his work, and that, as far as he was concerned, Webb was a good chief engineer. (Ray Franklin Deposition, p. 64).

36.    His personnel file (Defendant's Exhibit 19) reflects that he had an excellent work record and had received at least one designation as well as a glowing recommendation from his supervisor, Port Engineer Jim Angill, in a March 2000 letter to the United States Coast Guard.  (Defendant's Exhibit 19).  There is no evidence in the record of any disciplinary action against Webb by his employer, including any negative reviews, any reprimands, or any warnings. There is no evidence of excessive or unusual absenteeism.

37.    In the three full calendar years before Hurricane Katrina, Webb averaged $50,450 in annual earnings. (LeRoy Grossman Deposition, p. 16; and see Plaintiff's Exhibit 66 (plaintiff's tax returns)).

38.    Defendant's theory of the case is that plaintiff was not injured at all during the violence and chaos of hurricane Katrina. The evidence they present, including through cross-examination of plaintiff's doctors, is of various pre-existing ailments and issues they traced back as far as plaintiff's childhood. Having thoroughly considered the evidence defendant presented, this Court, as the fact-finder, does not find that plaintiff's current medical condition is neither "nothing" nor the same old things he talked to doctors about in years past. The only facts proven by defendant regarding the plaintiff's past medical history was that plaintiff was a typical human that had a manual labor job who needed that job to pay his bills from month to month. He had aches and pains and worries like everyone else in this country who works a hard job for a living. What is most significant is that he did not miss work and did not have any trouble doing the job while he was there. Defendant put him on a towboat on a regular schedule, in charge of the engines that must be working or nothing works, without any indication that they thought he had anything physically wrong with him.

**Webb's Testimony Concerning His Physical and Mental History**

39.    Webb has seen Dr. William Lee for "[p]retty much all my life." (Tyree Webb Trial Testimony, Day 1, Vol. 1, p. 57).  Defense counsel asked Webb during his deposition about his Boy Scout physical in 1970. (*Id.*).  Plaintiff had back pain before Hurricane Katrina but no one has ever recommended surgery for his back pain. (*Id.*)  He has had pain in his knees and ankles and underwent surgery on his right knee in 1993.  He was off of work approximately six weeks after the 1993 knee surgery. (*Id.* at 58).  He's had problems with reflux illness and has taken pills from time to time for stomach issues. (*Id.*)  But from the beginning of calendar year 2000 until the hurricane, Webb did not miss any extended period of time off work because of any physical or mental condition. (*Id.*)

Before the hurricane, Webb talked periodically with Dr. Lee about feeling nervous or feeling sad about things and Lee sometimes prescribed him medication. (*Id.* at 59).  But Webb never had - and never told Dr. Lee that he had - a depressed mood most of the day, nearly every day for a two-week period. (*Id.*).  Dr. Lee never asked him that question. (*Id.*)  Webb never had a significant decrease in his interest in or the pleasure he took in all or almost all of the activities he did nearly every day for a two-week period. (*Id.*)  Webb did not have a change in weight of more than five percent of his body weight in a single month when he was not dieting. (*Id.* at 59-60).  He did not have a decrease or increase in his appetite nearly every day for a two-week period. (*Id.* at 60).  He did not have

insomnia nor did he sleep unusually long every day for a two-week period.  (*Id.*).

Dr. Lee did prescribe, however, Ambien for sleep problems Webb had from time

to time, but he never asked Webb if he was having problems sleeping every day for

a two-week period.  (*Id.*).  Friends and family never reported that he seemed

agitated physically or physically slowed down nearly every day for a two-week

period.  (*Id.*).  He did not have fatigue or loss of energy nearly every day for a two-

week period or a sense of worthlessness or excessive or inappropriate guilt nearly

every day for a two-week period. (*Id.* at 60-61).  He never felt and others did not

report that he had a diminished ability to think or concentrate or that he was

indecisive nearly every day for a two-week period.  (*Id.* at 61).  Dr. Lee never

asked him any of these questions.  (*Id.*).

Before Katrina, Webb had a single episode of auditory hallucinations.  (*Id.*

at 144).  When it happened "I was about half asleep and half awake."  (*Id.*).  He

started talking in his sleep to "Myra Vance" - a woman he'd never known. (*Id.* at

144-45).

As previously mentioned, Dr. Lee did from time to time prescribe Ambien

to help him sleep.  (*Id.* at 61).  When Webb told him "I'm feeling a little anxious,"

Lee prescribed Xanax.  (*Id.*).  Before the hurricane, Webb did not experience and

did not tell Dr. Lee that he had experienced excessive anxiety or consistent worry

more days than not or in multiple areas of his life for at least six months in a row.

(*Id.* at 62).  He did not feel restless, keyed up, or on edge more days than not for

six months in a row.  He did not feel easily fatigued more days than not for six

months in a row or have difficulty concentrating or his mind going blank for more days than not for six months in a row.  He did not experience irritability more days than not for more than six months in a row.  He did not experience muscle tension or sleep disturbance more days than not for six months in a row.  (*Id.*).  He did have some of those symptoms on an occasional basis and when he described those symptoms to Dr. Lee, he would sometimes write Webb a prescription for pills.  (*Id.* at 62-63).

Webb told Dr. Lee that from time to time he had problems concentrating.  (*Id.* at 63).  Webb told Dr. Lee that from time to time he had difficulty in crowded situations.  (*Id.*).  Before Katrina, none of those issues had kept him from working his normal job.  (*Id.*).  Before Katrina, insomnia did not interfere with his work to the point that he had to miss a trip on the boat.  (*Id.* at 63-64).  Anxiety had never caused him to miss a trip on the boat.  (*Id.* at 64).  His occasional concentration difficulties did not interfere with his job duties.  (*Id.* at 64).

All of these findings, or lack of prolonged symptomology, are very significant insofar as the ultimate diagnosis of plaintiff's post-traumatic stress disorder ("PTSD") and his lack of other psychiatric disorders following his Hurricane Katrina experience, as well as before.

Unlike Dr. Lee's pre-Katrina examinations, Dr. McGhee asked Webb questions such as, "Have you had this almost every day for two weeks in a row." (*Id.* at 88).  Webb provided him with accurate answers to much more detailed questions than Dr. Lee had asked. (*Id.* at 88-89).  Since Katrina, Webb has had

what he considered to be a depressed mood most of the day nearly every day but
has improved with time.  (*Id.* at 89).  He had a significant decrease in the pleasure
that he got out of his normal activities since Katrina, most of the day nearly every
day since Katrina.  (*Id.*).  For example, he used to do all of his own mechanic
work on his cars and motorcycles.  He cannot do that anymore.  He used to like
to boat a lot, "and while I have been back out on a pleasure boat, I wasn't very
comfortable."  (*Id.* at 89-90).  The first time he was able to get onto a pleasure
boat since Katrina was in the summer before trial.  (*Id.* at 90).

### 1. Physical Injuries Caused by Defendant's Failure To Evacuate the *M/V Ann Peters*

40.    During the 40 or more years that Dr. Lee has treated plaintiff, Webb's
responses to his examinations and questioning were reliable.  (Dr. Lee
Deposition, Vol. 3, pp. 93-94).  During that entire time, Dr. Lee never diagnosed
plaintiff with malingering or symptom magnification.  (*Id.* at 94).

41.    Dr. Lee testified that, based on a physical therapy note from August 8,
2005 - just before Hurricane Katrina - plaintiff was "mildly or moderately
limited" in his range of motion.  (*Id.* at 96).  Since Hurricane Katrina, Webb's
range of motion has gotten progressively worse.  (*Id.* at 97).

42.    On March 13, 2006, plaintiff Webb went to his general practitioner, Dr.
Robert Lee, because he was sitting on his motorcycle and "was unable to keep
the motorcycle upright."  (*Id.* at 97-98).

43.     Dr. Keith Starkweather is a board certified orthopedic surgeon in

Clarksville, Tennessee.  (Dr. Starkweather Deposition, pp. 4-5).  He treated

Webb for "bilateral knee and bilateral ankle degenerative joint disease and pain.

He had noted at that time that he had had it for several years, but it had been

worsening over time." (*Id.* at 6).  Webb's history included the fact that he was

on a towboat during Hurricane Katrina and "had excessive strain placed on his

lower extremities during that point in time . . . ." (*Id.* at 11-12).  Dr.

Starkweather's diagnosis was longstanding osteoarthritis of the knee and ankle.

(*Id.* at 12).    In Dr. Starkweather's opinion, exposure to Hurricane Katrina

caused an exacerbation of the pre-existing arthritis but he could not testify

within a reasonable degree of medical certainty whether it was a permanent

change.  (*Id.* at 12-13).  Dr. Starkweather explained that a number of treatment

options that could potentially provide plaintiff with significant relief had not

been explored.  (*Id.* at 17).  Those treatment options include injections costing

between $75 and $120 per injection for a series of three to five injections.  (*Id.*

at 18).  If those injections fail to provide relief, surgical options including

arthroscopy costing between $8,000 and $10,000 are available.  (*Id.* at 18-19).

Potentially, plaintiff could undergo a knee replacement which would cost

between $15,000 and $20,000.  (*Id.* at 19.).  If those were to fail, a fusion

costing approximately $10,000 would be available.  (*Id.*).

44.     Dr. Starkweather testified that the symptoms caused by the hurricane in

Webb's lower extremity were "pain, weakness, occasional catching, and

instability or giving way type symptoms." (*Id.* at 15).  Webb was unable to hold the motorcycle up because his "leg just gave way."  (Tyree Webb Trial Testimony, Day 1, Vol. 1, p. 97).  Dr. Lee testified that it appeared from plaintiff's description that plaintiff was unable to hold up the motorcycle.  (Dr. Lee Deposition, Vol. III, pp. 97-98).

45.     The Court finds that Dr. Starkweather's most significant testimony is that exposure to Hurricane Katrina caused an exacerbation of the pre-existing osteoarthritis that could be permanent *or could resolve*.  (Dr. Starkweather Deposition, p. 12-13).  Based on plaintiff's admissions in his testimony and the surveillance video, the Court finds that the exacerbation had indeed resolved as of December 2010.

46.     Webb candidly testified that with occasional assistance from the deck crew, his physical problems (including his back and leg pain) would not preclude him from returning to work as a towboat engineer.  (Tyree Webb Trial Testimony, Day 1, Vol. 1, p. 96-97).  Webb obviously knows what the job that he did for over seventeen years required of him.

47.     The Court further finds that, based on Webb's present condition demonstrated in the surveillance video and considering Webb's own testimony, there is no need for the future treatment or restrictions recommended by Dr. Starkweather.  (See Deposition of Dr. Starkweather, pp. 17-20 (future treatment recommendations); pp. 15-16 (restrictions)).  Notably, Dr. Starkweather's restrictions were confined to Webb's lower extremities.  In

response to a question concerning the specific symptoms Dr. Starkweather

found in Webb, a colloquy between counsel and the witness clarified that those

symptoms were in Webb's lower extremities.  (*Id.* at 15).  The restrictions

recommended by Dr. Starkweather related to those lower extremity symptoms:

"Q.  In terms of dealing with the conditions that you described *in his lower*

*extremity*, Doctor, would it be advisable for him to refrain from excessive

climbing, bending, stooping, carrying heavy weight, things of that nature?  A.

Yes."  *Id.*  (emphasis added).

48.     Dr. Starkweather was asked specifically if there were any other

restrictions that Webb should observe and he responded "No, you covered

them."  (*Id.*).  Although Dr. Starkweather mentioned degenerative disc disease

in Webb's lumbar spine, this issue was never explored by either side and was

never clearly tied to any specific restrictions.  Thus, the medical evidence does

not support the conclusion that Webb is disabled by back pain.  The Court

finds that Webb's back pain would not preclude him from returning to his

former job.

49.     Defendant asked Webb at trial "to the extent that you're disabled currently

because, in part, of your back pain, that's not attributable to Hurricane Katrina,

is that right?" Webb answered in the affirmative.  Webb was then asked whether

back pain is one of the reasons that he is currently disabled and Webb also

responded affirmatively.  (Tyree Webb Trial Testimony, Day 1, Vol. 1, p. 137).

Webb's own testimony on this point was conflicting.  (Compare *id.* at 96-97)

(knee or back could "possibly" prevent working on the boat; see also testimony cited *supra* in which Webb indicated he could perform his job if he only had his physical limitations ).  Webb was not asked to support his opinion that he was partially disabled by his back pain.  When asked what about his situation today prevents him from going back to work, Webb answered "I can't concentrate.  I can't keep up with what I'm doing or with my tools. I just have a hard time concentrating and comprehending what I'm doing." (*Id*. at 96).

Webb's statements as to whether he is "disabled" and the causes of this disability pertain to subject matter that is outside of his competence.  As such, they are not admissible.  "It is uniformly held that where injuries complained of are of such character as to require skilled and professional persons to determine the cause and extent thereof, they must be proved by the testimony of medical experts, but, that a lay witness is competent to testify concerning those physical injuries and conditions which are susceptible to observation by an ordinary person." *Franklin v. Shelton*, 250 F.2d 92, 97 (10th Cir.1957); see also *Walker v. Shansky*, 28 F.3d 666, 672 (7th Cir.1994) (holding plaintiff not qualified to testify as to his medical condition).  Webb's testimony regarding whether he could perform a particular task or a particular job has some probative value; his determination whether a particular injury has caused a "disability" has none, because that determination requires expertise he does not possess.

Even if this Court assumed Webb was competent to make such assessments, and that they were "admissions" by him, such admissions would be

evidentiary admissions, such that they could be rebutted by other evidence.  See

*Higgins v. Miss.*, 217 F.3d 951, 954 (7th Cir. 2000) (stating that if statement is

evidentiary admission, "it would just be one more bit of evidence" on issue);

*Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1404 (7th

Cir. 1997) ("Judicial admissions are formal concessions in the pleadings, or

stipulations by a party or its counsel . . . .") (quoting *Keller v. United States*, 58

F.3d 1194, 1198 n.8 (7th Cir. 1995)) ; *id.* ("Because Baxter did not make a formal

concession that the NBC Fee was an EPI asset, it made no binding admission to

this effect.  The financial statements were thus merely evidence to be

considered."); *Keller*, 58 F.3d at 1198 n. 8:

> Judicial admissions are formal concessions in the pleadings, or
> stipulations by a party or its counsel, that are binding upon the party
> making them. They may not be controverted at trial or on appeal.
> Indeed, they are "not evidence at all but rather have the effect of
> withdrawing a fact from contention." Michael H. Graham, *Federal
> Practice and Procedure: Evidence* § 6726 (Interim Edition); see also
> John William Strong, *McCormick on Evidence* § 254, at 142 (1992).
> A judicial admission is conclusive, unless the court allows it to be
> withdrawn; ordinary evidentiary admissions, in contrast, may be
> controverted or explained by the party. *Id.* When a party testifying at
> trial or during a deposition admits a fact which is adverse to his
> claim or defense, it is generally preferable to treat that testimony as
> solely an evidentiary admission.  *Federal Practice and Procedure* §
> 6726, at 536-37.

Thus, even assuming Webb was competent to make admissions on this

subject matter, this Court is clearly not bound by these statements but may

instead evaluate them in conjunction with the testimony of the medical providers

and Webb's other testimony.

The primary medical support for a claim that Webb has a disability arising from back pain is Dr. Lee's chart, and it provides little support for such a claim. Dr. Lee's clinic note of September 13, 2007, describes Webb's history of back pain.  The note describes Webb's back pain as "intermittent" since 1997. (Defendant's Exhibit 1, Record of Dr. Lee of September 13, 2007). The note does not state that Webb is disabled or what criteria might be applied to determine the extent of any vocational disability. Webb had complaints of radiculopathy since at least six and a half years before the hurricane, yet continued to work. (See Defendant's Exhibit 1, Dr. Lee's Records, Clinic Note of January 18, 1999) ("There is pain running down to the left knee.").  An MRI in 2000 did show "bulging disc at L-5-S-1."  (Defendant's Exhibit 1,Dr. Lee's Records, Clinic Note of September 13, 2007).  In August of 2005, Webb received physical therapy for the back pain and was given a return to work slip.    On November 5, 2009, Webb reported to Dr. Lee that he was seeing Dr. Bethi for pain management and that "he'd been feeling fairly well with his pain."  (Dr. Lee Deposition, Vol. III, p. 84).

50.      Dr. Lee's testimony concerning plaintiff's physical condition must also be put into proper context. Dr. Lee characterized Webb's pre-hurricane range of motion as "mild to moderate" and opined that since the hurricane it had steadily gotten worse.   (See Dr. Lee Deposition, Vol. 3, pp. 96-97).  Although Dr. Lee did not measure Webb's range of motion during the September 13, 2007, visit (see *id.* at 86-97), the surveillance video demonstrated no impairment in Webb's range of motion.  There is no indication that Dr. Lee saw

the surveillance video and, accordingly, his opinions must be viewed carefully. Neither party attempted to quantify what "worse" meant in terms of impairments or, for that matter, what "mild to moderate" meant.  No physician has recommended surgery for Webb's lower back condition. Webb had the same symptoms for years before Hurricane Katrina and yet was able to work. After Webb reported identical low back symptoms in 2005, Dr. Lee released him to work without restrictions. (Defendant's Exhibit 1, Clinic Note of August 12, 2005).  Dr. Lee's September 13, 2007, clinic note indicates that Webb has not even undergone a functional capacity examination. (Defendant's Exhibit 1, Dr. Lee's Records, Clinic Note of September 13, 2007 and "To Whom It May Concern" letter of September 14, 2007).  The Court therefore finds that Dr. Lee provides an inadequate basis to conclude that Webb's lower back condition is partly responsible for any disability he currently has.

51.    In view of Webb's apparent symptom-free and unrestricted movements as shown in defendant's surveillance video and in light of Webb's testimony (see Tyree Webb Trial Testimony, Day 1, Vol. 1, p. 97), along with the absence of any persuasive medical testimony supporting a claim that Webb suffered disabling back pain, the Court finds that, considering only his physical condition, Webb could return to unrestricted duty as a towboat engineer, with or without assistance.

52.    The Court finds that, as a result of exposure to Hurricane Katrina as described in Dr. Starkweather's office records, Webb sustained an aggravation

of a pre-existing arthritic condition for a period of six months.  The effect of the aggravation was a temporary increase in base-line arthritic pain.

53.     The Court is mindful that Webb lives on uneven ground but there was no evidence that Webb spent hours at a time walking on this hilly terrain.  The Court finds that, contrary to defendant's suggestion, this is not a significant factor in determining whether Webb suffered a physical injury during Katrina.

54.     The Court further finds that Webb's trial testimony was sufficient to support a finding that the motorcycle incident was related to Webb's Katrina-related arthritic flare-up.  Webb testified that this is what kept him from holding the motorcycle up, stating, "My leg just gave way." (Tyree Webb, Trial Testimony, Day 1, Vol. I, p. 97).  Defendant is legally responsible for any subsequent harm that the original injury causes.  See *Heater v. Chesapeake & Ohio Ry. Co.,* 497 F.2d 1243, 1247 (7th Cir.1974) (finding employer liable for damages from heart attack resulting from back surgery necessitated by railroad's negligence); see also *Alholm v. Am. Steamship Co.,* 144 F.3d 1172, 1180-81 (8th Cir. 1998) (finding employer liable for damages from treating doctor's malpractice where employer liable for injury requiring medical care); see generally *CSX Transp. v. McBride,* 131 S.Ct. 2630, 2643 (2011). *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493, 499 (1957); see also Restatement (Second) of Torts, § 457. Webb denied that the motorcycle incident had caused any permanent injury. (Tyree Webb Trial Testimony, Day 1, Vol. 1, p. 97).  Although Webb no doubt suffered some

increased pain when the motorcycle fell on his leg (See Defendant's Exhibit 1, Records of Dr. Lee, Clinic Note of March 13, 2006) (noting that since the motorcycle trapped his left lower leg, "he has had severe pain in his ankle, foot and left knee."), the Court finds that there is insufficient persuasive evidence to conclude that the motorcycle incident disabled Webb in any way.

### 2.  Psychiatric Injuries Caused by Defendant's Failure to Evacuate the *M/V Ann Peters*

#### a.  Defendant's Allegations of Pre-Existing Psychiatric Disorders

#### i.  Webb did not Fail to Inform his Treating Psychiatrist of Pertinent History

55.     Defendant's expert Dr. Stacey Smith initially testified that she did not believe that Webb had PTSD in part because "Mr. Webb misrepresented his history". (Dr. Stacey Smith, Trial Testimony, Day 2, Vol. II, p. 247).  According to Dr. Smith, plaintiff's treating psychiatrist, Dr. McGhee, did not know that Webb had a decade long history of depression and anxiety before Hurricane Katrina. (*Id.* at 229).  "My recollection of this is that Mr. Webb denied to Dr. McGhee that he had any significant prior psychological or psychiatric difficulties, and that is -- when one reviews the record, that's a misrepresentation." (*Id.* at 231).  Dr. Smith testified that "what we have to go on is Dr. McGhee's record, which presents the history which, given to him by Mr. Webb, included at least the suggestion of the absence of any kind of prior psychiatric difficulties or vulnerabilities."  (*Id.* at 242).

56.     On cross-examination, Dr. Smith admitted that plaintiff Webb had in fact informed his treating psychiatrist, Dr. McGhee, of his previous history of

"depression and anxiety attacks." (*Id.* at 306). This was not only stated in Dr.

Smith's report in this case but is also borne out by Dr. McGhee's initial records

at Centerstone Clinic. (See Plaintiff's Exhibit 62, Centerstone Clinic Records, p.

11 ("Contributing Factors and Background")).  The Court finds that Webb did

not misrepresent his history to Dr. McGhee.

**ii. Dr. Smith's Diagnosis of Somatoform Disorder**

57.     Dr. Smith diagnosed Webb with somatoform disorder (pp. 236-238) and a

personality disorder (Dr. Stacey Smith, Trial Testimony, Day 2, Vol. II, pp. 238-

240) neither of which she related to the hurricane.  Each of these diagnoses will

be discussed in turn.

58.     Dr. Smith is the only physician in the case who diagnosed Webb with

somatoform disorder.  (*Id.* at 275).  Dr. Smith agreed that one of the diagnostic

criteria required by DSM-IV is sexual dysfunction other than pain.  (*Id.* at 275-

276).  Dr. Smith acknowledged that, before Hurricane Katrina, Webb did not

have sexual dysfunction other than pain. (*Id.* at 276).  Dr. Smith eventually

conceded that Webb did not meet the diagnostic criteria for somatoform

disorder.  (*Id.* at 286-91).  The Court finds that Webb does not have a pre-

existing somatoform disorder.

**iii. Personality Disorder Not Otherwise Specified**

59.     Dr. Smith diagnosed Webb with an unnamed personality disorder but

stated that "I'm not saying he meets criteria for anti-social personality

disorder." (*Id.* at 284-85).  In fact, Dr. Smith did not diagnose Webb with **any**

of the ten personality disorders recognized by DSM-IV. (*Id.* at 284).  Dr. Smith

acknowledged that Webb had been working full-time for decades, had glowing

recommendations from his supervisor, had received several promotions, and

made voluntary payroll deductions to a children's hospital.  (*Id.* at 280-83).

60.     Dr. Smith also acknowledged - eventually - that her diagnosis of an

adjustment disorder caused by the hurricane necessarily precluded a diagnosis

of personality disorder.  (*Id.* at 289-91).  Dr. Smith's testimony in this regard

was unduly evasive and inconsistent and merits setting forth in some detail:

> Q.  Originally, you diagnosed him with an adjustment disorder as a
> result of the hurricane, correct?
> A. Yes.
> Q.  And is it also true that in individuals who have personality
> disorders, it's improper to diagnose somebody with an adjustment
> disorder? You can't do both?
> A. Well, you could -- these type of adjustment reactions can be part
> and parcel of the personality construct, that's true.
> Q. So you have to rule that out?
> A. Again, it's a technicality. I would say, for instance --
> Q. Ma'am, you're here testifying as a forensic psychiatrist in federal
> court. We are being technical. And so what I'm going to ask you again
> is: Isn't it true that your diagnosis of adjustment disorder, if we
> follow the decision tree contained in DSM-IV, necessarily precludes a
> diagnosis of personality disorder?
> A. Again, it's a technical point.
> Q. It's true though, correct?
> A. If you want to negate that, then you would say it flows
> from the personality disorder, flows from the somatization disorder.
> Q. But you diagnosed him with an adjustment disorder which,
> therefore, necessarily rejects or precludes a personality disorder
> diagnosis under DSM-IV, true?
> A. You know, I'll have to look at that.
> Q. Is it so hard to say "yes", ma'am? I mean seriously. You're kind of
> nodding your head at me. But is what I just said true?
> A. Yes, it is true.

(*Id.* at 289-91).   This was one example of many evasions or inconsistencies in Dr. Smith's testimony.   The court always finds it very difficult to attach credibility to a witness that is as evasive and combative as a witness such as Dr. Smith who will not even admit the obvious.   One is left to wonder if such a witness is afraid that the fee the witness is being paid excludes such concessions.

61.      Dr. Smith was the only psychiatrist to give Webb an Axis II[5] diagnosis.   (*Id.* at 259).   Dr. Smith diagnosed Webb with a "not otherwise specified" personality disorder.   (*Id.* at 284-85).   Dr. Smith acknowledged that DSM-IV defines a personality disorder as "an enduring pattern of interexperience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time and leads to distress or impairment." (*Id.* at 283-84).   Over the course of nine transcript pages, Dr. Smith attempted to evade the simple question of whether she was applying that diagnostic criterion for a personality disorder.   (*Id.* at 283-91).   Even after the Court noted that Dr. Smith appeared to be trying to avoid answering this question, Dr Smith continued to evade the issue.   (*Id.* at 285).   Dr. Smith finally resorted to an outright distortion of the method used in DSM-IV.   The following colloquy between plaintiff's counsel and Dr. Smith illustrates:

> Q.  Let me ask it this way:  Are you using a different definition than DSM-IV?
> A.  Well, one of the problems with the line of questioning is that it's using a cookbook approach to doing psychiatry, and one of

---

[5] Axis II diagnoses include personality disorders and developmental disorders such as mental retardation.  (Dr. Smith, Trial Testimony, Day 2, Vol. II, p. 259).

the basic ideas of using the DSM is that it's not to be used in a cookbook fashion.

Q.  Actually, the opposite is true, ma'am, is it not?  Are you familiar with the Decision Tree Differential Diagnosis of Psychiatric Disorders, Appendix A of the DSM-IV?

A. Yes.

Q.  Okay. And that is, in essence, a cookbook.  You start off with what the initial problem is, you rule out other areas, correct?

A.  Yes.

Q. And you go from differential diagnosis of psychotic disorders, differential diagnosis of mood disorders, which is the depression we talked about before, correct?

A. Yes, uh-huh.

Q. And this requires that you're going to have to rule out whether the physiological effect is due to a general medical condition, due to a substance, whether it's medication, drug of abuse or a toxin, okay, and then once you rule those things out, you determine the type of present and past mood disorders.  Okay.  And those require specific timeframes, correct?

A. Yes.

Q. So -- and this is true throughout DSM-IV and Appendix A; there's a differential diagnosis of anxiety disorders and there's a decision tree there, true?

A.  Yes.

Q.  And you have to go step-by-step-by-step, correct?

A. Well, this is how we're trained to think about a differential diagnosis.

(*Id.* at 287-89).

62.     Dr. Smith admitted that her diagnosis of an adjustment disorder precluded diagnosing a personality disorder.  Although Dr. Smith attempted to dismiss the differential diagnostic requirement as a "technicality," *id.* at 289-90, she eventually admitted that the decision tree contained in DSM-IV does not permit a diagnosis of adjustment disorder to be made until one first rules out a diagnosis of personality disorder.  (*Id.* at 289-91).

Q. But you diagnosed him with an adjustment disorder which, therefore, necessarily rejects or precludes a personality disorder diagnosis under DSM-IV, true?

A. You know, I'll have to take a look at that.

Q. Is it so hard to say "yes", ma'am?  I mean seriously.  You're kind of nodding your head at me.  But is what I just said true?

A. Yes, it is true.

(*Id.* at 290-91).  Thus, Dr. Smith's own conclusions preclude a diagnosis of personality disorder.

63.    Dr. Smith admitted that Webb was not impaired vocationally before the hurricane. (*Id.* at 284).  Dr. Smith admitted she had never seen the testimony of Webb's family members regarding changes in Webb's ability to interact with other people since Hurricane Katrina.  (*Id.* at 287).  The Court finds that Webb did not have a pre-existing personality disorder.

**iv. Pre-existing Major Depressive Disorder and Anxiety Disorder**

64.    Defendant's retained expert psychiatrist testified that Dr. Lee never - in the forty years that he treated Webb - took a thorough psychiatric history.  "That's nowhere in his records."  (*Id.* at 272).  There was no indication in Dr. Lee's records that he even asked Webb whether he had daily symptoms of anxiety or depression for at least two weeks or a six month period where they were mostly present.  (*Id.* at 276-77; and see Defendant's Exhibit 1, Dr. Lee's Records, Clinic Note of March 19, 2002 ("He has some intermittent depression.  He says he is not depressed today, but it does tend to come and go, usually occurs maybe two to three times per week, lasts one day.") and Clinic Note of April 1, 2002 ("says he has not been depressed at all. He is leaving tomorrow to go back

on the boat and will be on it for 28 days.")).  Dr. Smith admitted that the only objective data concerning Webb's pre-hurricane psychiatric condition was in Dr. Lee's records but that they say nothing about the required elements for an anxiety disorder or for depression. (Dr. Smith, Trial Testimony, Vol. II, p. 273-74).  Dr. Smith then reversed herself and stated **"First of all, I do not think that Mr. Webb has ever had major depression.  I do not think that he has ever had an anxiety disorder."**  (*Id.* at 274) (Emphasis added).  The Court therefore finds that Webb did not have a pre-existing anxiety disorder or pre-existing major depressive disorder.

65.     Before Hurricane Katrina, Dr. Lee never diagnosed plaintiff with a personality disorder or with PTSD. (Dr. Lee Deposition, Vol. 3, p. 88-89).  Although Dr. Lee prescribed numerous drugs to plaintiff Webb in the years before the hurricane, it appears that Dr. Lee never attempted to make a proper psychiatric assessment.  For example, Dr. Lee was never asked whether plaintiff's symptoms existed for most of each day during a given two week period.  (See Depositions of Dr. Lee).  Before the hurricane, Webb talked periodically with Dr. Lee about feeling nervous or feeling sad about things and Dr. Lee sometimes prescribed him medication.  (Tyree Webb Trial Testimony, Day 1, Vol. 1, p. 58-59).  But Webb never had - and never told Dr. Lee that he had - a depressed mood most of the day, nearly every day for a two-week period.  (*Id.* at 59).  Dr. Lee never asked him that question.  (*Id.*).  Webb never had a significant decrease in his interest in or the pleasure he took in all or

almost all of the activities he did nearly every day for a two-week period.  (*Id.*).

Webb did not have a change in weight of more than five percent of his body

weight in a single month when he was not dieting.  (*Id.* at 59-60).  He did not

have a decrease or increase in his appetite nearly every day for a two-week

period.  (*Id.* at 60).  He did not have insomnia or sleep unusually long every day

for a two-week period.  (*Id.*).  Dr. Lee prescribed Ambien although he never

asked Webb if he was having problems sleeping every day for a two-week

period.  (*Id.*).  Friends and family never reported that he seemed agitated

physically or physically slowed down nearly every day for a two-week period.

(*Id.*).  He did not have fatigue or loss of energy nearly every day for a two-week

period or a sense of worthlessness or excessive or inappropriate guilt nearly

every day for a two-week period. (*Id.* at 60-61).  He never felt and others did not

report that he had a diminished ability to think or concentrate or that he was

indecisive nearly every day for a two-week period.  (*Id.* at 61).  Dr. Lee never

asked him any of these questions.  (*Id.*).

66.     The Court finds, based on this testimony, that defendant's reliance on a

pre-existing major depressive disorder or pre-existing anxiety disorder fails.

The Court concludes that Dr. Lee's prescription of drugs to plaintiff before

Hurricane Katrina does not, without more detailed information, establish the

recognized elements of an anxiety disorder or major depression.

67.     Although defendant relies on what it claims were "hallucinations"

experienced by Webb, the records and Webb's testimony do not support

defendant's theory.  In fact, Webb testified that, before Katrina, he had a single episode of auditory hallucinations.  (*Id.* at 144).  When it happened "I was about half asleep and half awake."  (*Id.*).  He started talking in his sleep to "Myra Vance" - a woman he never knew.  (*Id.* at 144-45).

68.    Dr. Smith testified that she is familiar with the phenomena of hypnagogic and hypnopompic hallucinations.  (Dr. Stacey Smith, Trial Testimony, Day 2, Vol. II, p. 265).  These hallucinations occur when one is falling asleep or waking.  (*Id.*).  Hypnagogic and hypnopompic hallucinations are not considered pathologic.  (*Id.*).  Dr. Smith had no argument as to whether nearly everyone experiences such a hallucination at some time in their lives.  (*Id.*).  The fact that Webb may have had an auditory-verbal hallucination during the time he was either going to sleep or waking up is not clinically significant without more information.  (*Id.* at 266-67). "[I]f your point is, should I have, you know asked more questions about that, that's legitimate."  (*Id.* at 266).

69.    The Court finds, based on the testimony summarized in paragraphs 62 through 66, *supra*, that plaintiff did not have a diagnosable psychiatric illness before Hurricane Katrina.

70.    To the extent that the evidence suggests that plaintiff did have some psychiatric or physical infirmity before Hurricane Katrina, it is clear that plaintiff was able to and did work as the chief engineer on an inland river towboat until shortly after he was exposed to Hurricane Katrina.  Before

Hurricane Katrina plaintiff was never diagnosed with PTSD and had never seen a psychiatrist. (*Id.* at 261).

71.    Dr. Smith presumed that Webb was not impaired vocationally before the hurricane because he was working. (*Id.* at 280).

72.    Even if plaintiff did have some diagnosable psychiatric condition that pre-dated Hurricane Katrina, Dr. McGhee explained that it would have no bearing on the diagnosis of PTSD because such diagnoses would simply make Webb more susceptible to PTSD. (Dr. Michael McGhee Deposition, p. 82).

**v. Psychiatric Conditions Caused by Defendant's Failure to Evacuate the *M/V Ann Peters***

73.    Dr. Michael McGhee is a psychiatrist who is the clinical chief of the Traumatic Brain/PTSD Clinic at the Fort Campbell military base. (*Id.* at 4-5). As clinical chief, Dr. McGhee treats patients with posttraumatic stress and other psychiatric disorders. (*Id.* at 5). Dr. McGhee is "very familiar" with PTSD and the diagnostic criteria for that diagnosis in the DSM-IV. (*Id.*). Those criteria are the result of published peer reviewed studies. (*Id.* at 6). Both Dr. McGhee and Dr. Smith recognize and utilize the DSM-IV criteria. (*Id.*; Dr. Stacey Smith, Trial Testimony, Day 2, Vol. II, p. 267).[6]

---

[6] The current version is DSM-IV-tr, for "transitional." (Dr. Smith, Trial Testimony, Day 2, Vol. II, p. 267) Neither the parties nor the psychiatric witnesses identified any differences between DSM-IV and DSM-IV-tr and the Court assumes that if there were any differences that were significant for purposes of this case, that the parties would have identified them through testimony.

74.    Dr. McGhee explained that the threshold requirement for a diagnosis of

PTSD is exposure to a life-threatening event, with a response of fear,

hopelessness or feeling out of control. (McGhee Deposition, p. 6-7).  Dr.

McGhee testified that because the diagnosis requires exposure to such an event,

whether a person has a personality disorder or other condition prior to the

event does not matter. (*Id.* at 8).  On cross-examination, Dr. McGhee explained

that "an event qualifies as being sufficiently traumatic to form the basis for a

PTSD diagnosis" if "it's said to be a life-threatening event." (*Id.* at 32-33).  Dr.

McGhee denied that prior psychiatric conditions could, by themselves, cause

PTSD.  (*Id.* at 35-36).  "But there is nothing out there right now that says if a

person has this, this, or this, that they're going to get PTSD.  There's no

biological theories -- I mean, there's no theories that -- that have been proven at

this time." (*Id.* at 36).  What is required is a traumatic event.  (*Id.* at 82).

75.    Webb described to Dr. McGhee fearing for his life during the hurricane.

(*Id.* at 60-61).  Dr. McGhee's opinion is that Webb suffered exposure to a

traumatic event involving threatened death or feelings that his life was in danger

during Hurricane Katrina.  (*Id.* at 65).  In Dr. McGhee's opinion, Webb reacted

with panic, fear of death, and feelings of helplessness.  (*Id.*).

76.    Defendant has pointed to no other event, condition, or stimulus in which

Webb related to anyone that he feared for his life before Hurricane Katrina.

Plaintiff did not report any others to his treating medical providers.

77.     Instead, defendant has challenged plaintiff's basic premise that his exposure to Hurricane Katrina on board a towboat at Mile 55 of the Mississippi River was a life-threatening experience.  Defendant's position is just as tenuous as the testimony of Vogene Couch, which the Court has found to be incredible. The defendant's tack is to admit liability and then to suggest [despite the obvious disastrous decision to ride out the hurricane] that the physical and psychological trauma of having an eighty barge tow torn loose and tossed around by a hurricane along with the towboats adjacent thereto like so many toys in the bath tub was not such a bad ride after all – a lucky strike for the company who took a gamble with peoples' lives.  The credible evidence came from plaintiff Webb, Captain Franklin, Chief Engineer Powell, Pilot Sandage, and First Mate William Love.  Their testimony describes a horrific event in which a rationale reaction was fear of imminent death and helplessness.  Even Dr. Smith acknowledged that the hurricane would meet the criteria for a stressor sufficient to trigger PTSD.  (Dr. Smith, Trial Testimony, Day 2, Vol. II, pp. 291-92).

78.     Dr. McGhee testified that plaintiff's exposure to Hurricane Katrina caused PTSD and contributed to cause major depressive disorder.  (Dr. McGhee Deposition, p. 63).

79.     Dr. McGhee has seen Webb over fifty times since October of 2005. (Defendant's Exhibit 2; Plaintiff's Exhibit 62; Centerstone Clinic Records and McGhee Records; Dr. McGhee Deposition, p. 63; Dr. Smith Trial Testimony,

Day 2, Vol. II, p. 293).  Webb's responses to Dr. McGhee's questions have been

consistent and reliable over the course of time. (Dr. McGhee Deposition, p. 74).

In Dr. McGhee's opinion, and who better to opine on the subject matter,

plaintiff was not exaggerating or engaging in symptom magnification.  (*Id.* at

64).

80.    Webb has exhibited hyper arousal, insomnia, agitation, irritability, or

outbursts of rage in connection with the aftermath of the hurricane. (*Id.* at 66).

He has re-experienced the trauma of the hurricane in the form of dreams,

flashbacks, and intrusive memories.  (*Id.*).  Webb has exhibited avoidance

behavior including trying to avoid thunderstorms, lightning, and rain. (*Id.*).

81.    Although Dr. Smith originally asserted that Webb told her that he "was

afraid to be around water since Hurricane Katrina," (Dr. Smith Trial

Testimony, Day 2, Vol. II, p. 251), this statement was not in Dr. Smith's report.

(*Id.* at 260).  Dr. Smith admitted that she would "generally" put such statements

in her report.  (*Id.*).  She could not recall what page in her report that statement

was located. (*Id.*).  She did not recall whether her report even referenced this

statement.  (*Id.*).  To the extent that Dr. Smith's testimony directly conflicts with

Webb's testimony, the Court believes Webb rather than Dr. Smith.

82.    Webb has exhibited a numbing of emotions and reduced interest in the

outside world.  In Dr. McGhee's opinion, this "probably contributed

significantly to his divorce." (Dr. McGhee Deposition, p. 66).  Webb does not

interact in activities in the same way that he did before the hurricane.  (*Id.*).  He

still rides motorcycles "but he used to be an avid motorcycle rider and he doesn't do that very much anymore.  Clearly, it's changed his interaction with his family.  He doesn't tolerate the noise of his grandchildren much anymore . . . .  He goes into the basement when they -- when they come over."  (*Id.* at 67).

83.      Dr. McGhee's testimony in regard to Webb's changed interaction with his family and other social activities was supported by Webb's parents and ex-wife.  Before Hurricane Katrina, Webb had never complained to his ex-wife about losing his train of thought, forgetting things, or feeling tired or foggy in the morning.  (Kathy Webb Deposition, p.12).   Before Katrina, the Webbs enjoyed recreational activities together.  (*Id.*).  "We did everything together," including motorcycle rides, vacations, and boating.  (*Id.*).  None of the activities they enjoyed together before the hurricane are the same since the hurricane.  (*Id.* at 25-26).  When Kathy Webb picked the plaintiff up in Metropolis, Illinois after the hurricane, Webb was "[v]ery withdrawn, shaky, [and] crying."  (*Id.* at 16).  Although Webb appears reasonably calm in the post-hurricane crew meeting video (Plaintiff's Exhibit 28), he is only visible for a few seconds and his demeanor is not inconsistent with being withdrawn as his wife describes.  When they got home, Webb "broke down and cried.  And then, from then on, nightmares, anxiety, shook inside out.  It was hard for him to talk about." (Kathy Webb Deposition, p. 18).  Webb continues to receive counseling.  (*Id.*).  Since the hurricane, Webb has a hard time remembering things and concentrating.  (*Id.*).  He loses things.  (*Id.*).  "He used to love to be with the

family, and now it's like he gets anxious, panic attacks." (*Id.* at 26).  Webb's relationship with his children and grandchildren has changed.  "He can only tolerate 15, 20 minutes to be around the children.  A lot of times when they come over, he has to go either downstairs or go out to the garage, and especially with the grandchildren." (*Id.* at 27).  Before the hurricane, they were a very close family and "did everything together." (*Id.*).  Tyree Webb is "not the same man" who left for the boat in August of 2005.  (*Id.*).  June Webb is Tyree Webb's mother.  (June Webb Deposition, p. 4).  She described her son before the hurricane as "a very happy, bubbly, outgoing person that enjoyed people . . . ." (*Id.* at 5).  After the hurricane, he changed "[d]rastically." (*Id.*).  "He did not seem to want anybody around.  It was like he just kind of pulled into a shell and he didn't want anybody around." (*Id.* at 6).  Although Webb liked to laugh before the hurricane, *id.* at 5, his mother could not recall the last time she heard him laugh.  (*Id.* at 6-7).  "He's just a totally different person." (*Id.* at 6).

84.    The Court's own observations of Webb during trial confirm that Webb appears unable to concentrate for any period of time.  He paused frequently before answering questions, appearing to lose his train of thought several times.  Even on direct examination, he seemed to struggle to find the energy to respond to questioning.  If Adderall is supposed to be a stimulant, it was not working on plaintiff who was listless and withdrawn.  This is not to say that he did not try, to the contrary, he appeared to be putting forth good effort to respond to questions.  At times he appeared a bit frustrated with his difficulties.

85.    Dr. McGhee testified that at one point, plaintiff became suicidal and had to be hospitalized.  This was caused in part by Webb's PTSD.  (Dr. McGhee Deposition, p. 65).

86.    According to Dr. McGhee, Webb's PTSD symptoms have caused him to struggle with tasks requiring concentration for more than ten to fifteen minutes. (*Id.* at 68).  Webb loses keys and tools and no longer manages his own finances. (*Id.* at 69).  He used to re-build cars and motorcycles and can no longer do those activities.  (*Id.* at 68).

87.    Webb stays in his vehicle rather than sitting in the waiting room until it's time to be seen by the doctor.  (*Id.* at 69).

88.    Webb now has a low frustration tolerance and his confidence is significantly lower than it was previously.  (*Id.* at 71).

89.    In Dr. McGhee's opinion, Webb is incapable of returning to his previous occupation because of his PTSD.  (*Id.* at 69).  He becomes frustrated with tasks he used to enjoy and throws things across the room. (*Id.* at 67-68).  Dr. McGhee believes that it would take significant vocational rehabilitation for Webb to ever function at a full-time job in competitive gainful employment, and that it may not be possible.  (*Id.* at 71-72).  "It would take significant vocational rehabilitation to actually get him back to the point where he could even look for a job because he stresses out in looking for a job.  And he's -- he's actually looked for -- I mean he's looked for employment, and just in the process of doing that, he gets nervous, he gets anxious." (*Id.*).

90.   Dr. McGhee opined that Webb's PTSD is permanent.  (*Id.* at 67).

91.   DSM-IV uses an axial system of diagnosis.  (Dr. Stacey Smith, Trial Testimony, Day 2, Vol. II, p. 267).  Axis I consists of clinical syndromes;  Axis II is personality disorders and mental retardation;  Axis IV is psychosocial and environmental problems or stressors in life and Axis V is the Global Assessment of Functioning or "GAF."  (*Id.* at 268). The GAF is a general numeric estimate of how well a person is functioning.  (*Id.*).

92.   Dr. McGhee assessed Webb's GAF as between forty and fifty-eight.  (Dr. McGhee Deposition, p. 73).  Dr. McGhee explained that when the GAF "starts getting below 40, you start getting to the point of -- that there's significant need for -- for some level of support to help assist that individual, whether it be with activities of daily living, whether it be concerns about his mental capacity, or to include his safety.  So once you're talking about 40s, 30s, 20s, you're looking toward hospitalization and things of that nature."  (*Id.* at 73).

93.   In contrast, Dr. Smith diagnosed Webb with a GAF of sixty.  (Dr. Stacey Smith, Trial Testimony, Day 2, Vol. II, p. 270).  Dr. Smith routinely assigns a GAF score to persons that she evaluates as part of her practice.  (*Id.* at 268).  The Court took judicial notice of *Merritt v. Astrue,* 609 F. Supp. 2d 850 (E.D. Mo. 2009), in which Dr. Smith evaluated an individual who stayed in his room all day, did not like to be around other people, had worked only occasionally in his life, had used cocaine and PCP regularly for fifteen years with concomitant family and financial problems but reported having been clean for two years, and

who had been shot three times including once in the head.  (Dr. Stacey Smith, Trial Testimony, Day 2, Vol. II, pp. 269-70).  Dr. Smith diagnosed him with "depressive disorder not otherwise specified[,] cocaine dependence and PCP abuse, antisocial personality disorder, and a GAF of 65."  (*Id.*).  Dr. Smith's assessment of Webb's GAF was worse than Merritt's GAF of 65.  (*Id.* at 270).

94.     The Court realizes that the GAF represents the clinician's assessment of the patient's current level of functioning.  The Court is aware that Dr. McGhee assessed Webb's GAF earlier than did Dr. Smith.  But the Court does compare Dr. Smith's assessment of Webb with her own assessment of Merritt for perspective.  The specific factors from the Merritt assessment that the Court considers are the indicators of his then present level of functioning: that he stayed in his room all day and was not working.  This suggests a serious level of impairment.  Dr. Smith's assessment of Webb was even worse than Merritt. Of course, Dr. Smith was not a retained expert in the Merritt case as she was in the case at bar.  Her credibility is adversely impacted accordingly by this and the other issues explored by the Court hereinbefore and below.

95.     Dr. McGhee prescribes Abilify, Adderall, Minipress and Cymbalta for Webb. (Dr. McGhee Deposition, p. 75).  Despite those medicines, Webb still exhibits all the criteria the DSM-IV recognizes for PTSD diagnosis.  (*Id.* at 76).

96.     Webb's prognosis "would probably be poor" according to Dr. McGhee. (*Id.* at 74).  "There is no area of his life that he would say, or that he has does say, has not been affected since the event."  (*Id.* at 76).

### vii. Dr. Smith's Diagnosis of Adjustment Disorder

97.     Dr. Smith explained that DSM-IV categorizes three specific entities that result from specific stressors: adjustment disorders, post-traumatic stress disorder, and acute stress disorder.  (Dr. Smith, Trial Testimony, Day 2, Vol. II, p. 299-300).  The definition of an adjustment disorder is that the response is out of proportion to the stressor.  (*Id.* at 300).  In this case, the stressor was Hurricane Katrina.  (*Id.*).  The mental state at the time of the event is not part of the criteria for an adjustment disorder but is part of the criteria for PTSD. (*Id.*).  Both PTSD and acute stress disorder require the presence of an extreme stressor, while a diagnosis of an adjustment disorder does not.  (*Id.* at 300-01).  One of the distinguishing characteristics of PTSD vis-a-vis an adjustment disorder is that an adjustment disorder is a response out of proportion to the stressor.  (*Id.* at 298-99).  Stressors for an adjustment disorder could include things like breaking up with a boyfriend or getting a bad write-up at work.  (*Id.* at 299).  Dr. Smith acknowledged that the hurricane would meet the criteria for a stressor sufficient to trigger PTSD.  (*Id.* at 291).  The Court finds that Webb does not have an adjustment disorder because his responses are not out of proportion to the stressor and because the symptoms have lasted too long to justify a diagnosis of adjustment disorder. Instead, the Court credits Dr. McGhee's testimony that Webb suffers from PTSD.

98.     Dr. Smith acknowledged that she had testified in her deposition that if the symptoms Webb describes are true, then a diagnosis of PTSD is appropriate.

(*Id.* at 298).  Since the hurricane, Webb's symptoms as documented in the medical records she reviewed include nightmares since the hurricane, difficulty concentrating, losing track mid-task and misplacing things, and engaging in avoidance behavior.  These could all be symptoms of PTSD.  (*Id.* at 295).

99.    The Court finds, based on all of the evidence, that Dr. McGhee's opinions are more credible than Dr. Smith's.  Dr. McGhee has an extensive background in treating and diagnosing PTSD from his work as head of a military PTSD clinic. Dr. Smith lacks a similar background. (*Id.* at 294-95).  Dr. McGhee provided ample support for his diagnoses and conclusions.   Dr. Smith's testimony was riddled with inconsistencies and evasiveness.

**vi. Webb's Testimony Concerning His Injuries**

100.    Webb met his wife, Kathy, when they were both sophomores in high school. They were married in 1980.  Although they have never separated, they were divorced in 2009.  (Tyree Webb Trial Testimony, Day 1, Vol. 1, p. 54).  The hurricane experience destroyed Webb's sex drive to the point that he has little interest in sex.  (*Id.* at 92).  When Kathy touches him or tries to get close to him he stated, "I feel like I'm letting her down because I don't want to participate." (*Id.*).  He feels like withdrawing.  (*Id.*).

101.    He is consistently fatigued almost every day for the past six years.  (*Id.* at 93).  "I don't have much energy.  Don't feel like doing much." (*Id.*).  His ability to concentrate and think is diminished now.  "I'm not good at concentration at all." (*Id.*).  Before the hurricane, it would go away in "a matter of days.  Now it's

constant." (*Id*.).  Webb tends to avoid storms by going into the basement and terminated one of his recent boat trips early when he thought there might be a storm coming.  (*Id*. at 93-94).  Since the hurricane, Webb is more irritable on an on-going basis.  "I have a hard time being around my grandchildren, the noise and the ruckus." (*Id*. at 94).  His frustration tolerance is lower since the hurricane.  (*Id*.).

102.   Since Hurricane Katrina, there has been a significant difference in the frequency and the intensity of the emotional symptoms that he has had.  (*Id*. at 147).  Before the hurricane, Webb performed his job as scheduled for years despite the medical history elicited by the defendant on cross-examination.  (*Id*. at 147-48).

103.   Exhibit 66 is Webb's tax returns going back to calendar year 2000.  (*Id*. at 95).  In the five years immediately preceding the hurricane, Webb earned $47,647,00 in 2000, $44,298.00 in 2001, $49,902.00 in 2002, $49,472.00 in 2003, and $51,472 in 2004.  (*Id*.).  He has not worked since the storm.  (*Id*. at 96).  Dr. McGhee has prescribed medicine and Webb has followed McGhee's recommendations.  (*Id*.).  He would like to return to work as an engineer because he enjoyed the work, but he believes he no longer can do the work because "I can't concentrate.  I can't keep up with what I'm doing or with my tools.  I just have a hard time concentrating and comprehending what I'm doing." (*Id*.).  On a towboat he would be working for twelve hours a day and required to remember to do specific tasks at specific times.  (*Id*.).

104.    Webb applied for long term disability with the company and from time to time they have required him to be examined by psychiatrists.  (*Id.* at 98).  The last time he saw a psychiatrist with regard to the long-term disability insurance was "two to three months ago."  (*Id.*).  The policy has continued to provide him with benefits.  (*Id.*).  Webb receives $363.44 each month from a long-term disability policy through Liberty Mutual.  Webb testified that this was considered part of his total pay.  (*Id.* at 134).  Webb also receives $840.00 per month in maintenance from TECO.  (*Id.* at 136).

105.    Webb is currently on Cymbalta, Valium, Zanaflax, Opana, and Adderall. (*Id.* at 100).  Webb's appearance at trial is an improvement over how he was at the time of his deposition.  (*Id.*).  Before the accident, Webb was outgoing and would visit other people.  (*Id.* at 101).  On his days off, Webb would visit the older people in the community and run errands for his parents, who are both alive.  (*Id.*).  He enjoyed riding his motorcycle, working and tinkering on it.  "I've got an old station wagon I fooled with."  (*Id.*).  He still rides "the motorcycle some but nothing like what it used to be."  (*Id.*).  Nothing is like what it used to be for him anymore.  (*Id.*).

106.    Webb attended the depositions that he was told to attend.  (*Id.* at 121). Webb attended depositions involving the crew members of the two boats and his own family members.  (*Id.* at 143-44).

**vii. Permanence and Disability**

107.    The Court finds Dr. McGhee's conclusion that Webb's PTSD is permanent

and disabling to be persuasive and supported by the vast majority of the

evidence.  In particular, the Court had the opportunity to observe Webb's

demeanor in the courtroom.  The Court finds that Webb was a credible, honest

witness and finds his testimony concerning his condition to be very persuasive.

Dr. Smith admitted that PTSD can be permanently disabling.  (Dr. Stacey

Smith, Trial Testimony, Day 2, Vol. II, p. 245).

108.    Even Dr. Smith's description of the current state of the medical literature

supports this conclusion.  She testified that there is a physiological basis for

many of the symptoms of the anxiety disorders.  (*Id.* at 263-64).  Indeed, "all

psychiatric disorders are forms of medical disorders, so I don't believe that

there is a psychiatric disorder that doesn't have some kind of biologic

underpinning." (*Id.* at 264).  Dr. Smith explained:

> Q.  All right.  But the research, the current research, holds that the
> reason that PTSD can be so long-lasting is that there has been an
> alteration in the chemical system of the brain, correct?
> A.  In severe cases there have been shown to be some long-lasting
> findings in the brain to support some changes in the brain, that's
> true.

(*Id.* at 264-65).

109.    Dr. Smith confirmed that Webb blamed the company vice-president, David

O'Neill, for keeping him in the path of the hurricane.  (*Id.* at 293).  Dr. Smith

admitted that DSM-IV states that PTSD may be especially severe when the

stressor is of human design, with the thought being "[w]hy would another

human being put me through this experience." (*Id.* at 293-94). She also acknowledged that DSM-IV states that such a human element in the stressor is one of the things that can make the disease entity so long-lasting. (*Id.* at 294).

110. Dr. Leroy Grossman is plaintiff's economist. None of Dr. Grossman's qualifications, methodology, or his results has been questioned by defendant. Plaintiff has presented an adequate foundation for Dr. Grossman's opinions including the following: Dr. Grossman received his Ph.D. in Economics from Vanderbilt University in 1963 (Dr. Grossman Deposition, pp. 4-5); he received academic honors including a Carnegie Fellowship (*Id.* at 5); he began his career at the Federal Reserve and since 1963 has been on the faculty of St. Louis University. (*Id.* at 6); and he has published scholarly articles in the field of economics (*Id.*; CV of Dr. Grossman, Plaintiff's Exhibit 35.). Dr. Grossman is familiar with analyzing the present value of a stream of income. (Dr. Grossman Deposition, p. 6). Dr. Grossman utilizes standard methods that have been published in the field of economics and subjected to peer review. (*Id.* at 6-7).

111. Because the law requires an after-tax wage rate, to be consistent Dr. Grossman utilizes municipal bond rates to provide an after tax rate of interest. (*Id.* at 9-10). Dr. Grossman explained that he uses municipal bond rates "because we are dealing with the individual's after tax loss. If we used U.S. Government bonds, while it's true that the verdict would be tax free, the interest earned on that verdict would be subject to income taxes. And the effect would be then that you would be taxing Mr. Webb or whoever we were doing the case

for, we would be taxing them twice.  So in order to be consistent throughout, we compare wage growth on an after tax basis against interest rates on an after tax basis against interest rates on municipal bonds." (*Id.* at 10).  Dr. Grossman found that over the last sixty years, the net real discount rate was approximately 1.1%.  (*Id.*).  But "I used one and a half percent, just to be on the conservative side." (*Id.*).

112.   Dr. Grossman did not consider any merit increases in his wage analysis. (*Id.* at 11).  Dr. Grossman assumed that Webb would continue to be employed as an unlicensed chief engineer.  (*Id.*).  Dr. Grossman used Webb's date of birth of November 26, 1958, to obtain a life expectancy of approximately thirty additional years, or to age seventy-seven.  (*Id.* at 12).  Dr. Grossman had plaintiff's tax returns for the years 2002 through 2005 and from those returns he was able to calculate an average tax rate of less than 7.6% but used 7.6% which was the tax rate in the last year before his injury.  (*Id.* at 13-14).  Dr. Grossman also relied on information provided by the defendant's corporate representative, Jay Kitchener, that the value for plaintiff's fringe benefits was between twenty-five and thirty percent of his base wages as well as the current wage rate for an unlicensed chief engineer of $330 a day for days he worked, or $60,060 per year.  (*Id.* at 14-15).  Grossman calculated different scenarios based on Webb's continuing to work to either age 66.7 or until 70 years of age and that he would either be permanently unemployable or would be able to work at minimum wage of $7.25.  (*Id.* at 15-16).

113.   Dr. Grossman averaged Webb's income for the three years before the hurricane to arrive at an annual figure of $50,450 and a past wage loss of $302,700.  (*Id.* at 16).  He then added 25% to account for the fringe benefit package and subtracted 7.6% of the base wage (representing income taxes) to arrive at a net past loss of $355,370.  (*Id.* at 16-17).

114.   To calculate Webb's future losses, Dr. Grossman used Jay Kitchener's figures to calculate a net annual wage of $74,150.  (*Id.* at 20-21).  He then calculated the present value of that stream of earnings for the next 13.9 years.  (*Id.* at 21-22).  If Webb is unemployable, his future loss to age 66.7 is $924,112.  (*Id.* at 22).  Adding the past loss to the future loss yields a total loss of $1,279,482.00.  (*Id.*).  If Webb would have worked until age seventy, the present value of the 17.2 year stream of earnings is $1,116,813 which, added to the past loss, totals $1,472,183.00.  (*Id.*).

### D. Recoverable Damages

115.   The Jones Act incorporates the provisions of the Federal Employers Liability Act, 45 U.S.C. §§ 51 *et.seq.* ("F.E.L.A.").  *Deering v. Nat'l Maint. & Repair, Inc.*, 627 F.3d 1039, 1043 (7th Cir. 2010).  Thus, the rules that govern the liability of railroads under the Federal Employers Liability Act also govern the liability of employers under the Jones Act.  *Yehia v. Rouge Steel Corp.*, 898 F.2d 1178, 1184 (6th Cir. 1990).

Liability under the Jones Act includes the "even the slightest" causation standard of the F.E.L.A.:  "the test of a jury case is simply whether the proofs

justify with reason the conclusion that employer negligence played any part, **even the slightest**, in producing the injury or death for which damages are sought." *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493, 499 (1957) (emphasis added).  This principle was recently re-affirmed by the Supreme Court in *CSX Transp. v. McBride,* 131 S.Ct. 2630, 2643 (2011).

Damages recoverable under the Jones Act or for unseaworthiness include normal tort damages of pain and suffering, disability, lost wages, loss of earning capacity, and medical expenses. 29 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE - CIVIL § 701.01 (Matthew Bender 3d Ed.); STEVEN F. FRIEDELL, BENEDICT ON ADMIRALTY, Vol. 1B-III, § 32 (Mathew Bender); *Allen v. Seacoast Prods., Inc.*, 623 F.3d 355, 365 n. 23 (5th Cir. 1980*), overruled by Gautreax v. Scurlock Marine*, 107 F.3d 331, 339 (5th Cir. 1997).

The Jones Act also authorizes recovery "for the physical and mental effects of the injury on his ability to engage in those activities which normally contribute to the enjoyment of life, including, for example, his avocations." *Downie v. United States Lines Co.*, 359 F.2d 344, 347 (3rd Cir. 1966) (citing *Dagnello v. Long Island R.R. Co.*, 289 F.2d 797 (2nd Cir. 1961)).  This element of damages can include a wide range of compensable elements such as the "inability to dance, bowl, swim or engage in similar recreational activities; inability to perform customary household chores; and, inability to engage in the usual family activities." *Downie*, 359 F.2d at 348 n. 3.

125.   The Court awards damages as follows:

a.  Past physical pain caused by the aggravation of Webb's arthritis:

**$45,000.**

This figure is explained, *supra,* in Paragraphs 52-54.

b.      Future wage loss to age 66.7:

**$924,112**.

c.  Past wage loss:

**$302,700.**

d.  The Court adopts Dr. Grossman's calculation of Webb's wage loss and finds that Webb would have retired at age 66.7.  This is based on a number of factors including testimony that whenever Webb was off of work due to injury, he always wanted to return to work as soon as possible.  Webb's life expectancy exceeds age 66.7.  The Court has previously found that Webb is not disabled by his lower back condition.  In addition, there is no evidence that any physician has recommended surgery for Webb's lower back condition (see Paragraphs 46, 47, and 48, *supra*).  The Court therefore finds that, if Webb were not disabled by his psychiatric condition, Webb would most likely have continued to work as a towboat engineer or comparable work until age 66.7.  The Court finds that Webb is unemployable in any capacity for the reasons set forth in Paragraph 86, *supra.*

e. The Court finds that Webb has not reached maximum medical improvement because he continues to improve.  Both Webb's testimony and his

actions (Defendant's Exhibit 39), demonstrate that he continues to improve. Defendant has been paying Webb at the rate of $28.00 per day (see par. 105, *supra*)[7], and Webb has not challenged this rate.  The Court therefore finds that defendant shall pay Webb the sum of $28.00 per day in maintenance until such time as Webb reaches maximum medical improvement.

    f. Pain and Suffering Caused by Psychiatric Disorders:    **$ 2,750,000** ($750,000.00 for past pain and suffering and $2,000,000.00 for future pain and suffering).

    Webb suffered significant disability, loss of enjoyment of life, and mental anguish as a result of the defendant's negligence.  Webb's family life has been seriously disrupted to the point where he avoids his grandchildren and got divorced all as a result "in whole or in any part, even the slightest," of conditions caused by his exposure to the hurricane (See Paragraphs 82-84, *supra*).   He has tried to engage in activities that he formerly enjoyed but either cannot or he has terminated them quickly.  His family describes him as a different person.  (See Paragraph 83, *supra*).  At one point he became suicidal and had to be hospitalized.  (See Paragraph 85, *supra*).  Based on both Dr. McGhee's and Dr. Smith's descriptions of Webb's current level of functioning (see Paragraphs 90-96, *supra*.), the Court finds Webb has incurred and will incur significant pain and suffering as a result of his psychiatric disorders.

---

[7] $840/30=$28

Even if the Court were to credit defendant's argument that Webb was subsequently "disabled" as a result of his lower back condition that alleged disability did not occur until after Hurricane Katrina, "[o]nce a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, he has done enough to withstand summary judgment on the ground of absence of causation." *BCS Servs., Inc. v. Heartwood 88, LLC,* 637 F.3d 750, 758 (7th Cir. 2011). The burden of proving that another event was an intervening or superseding cause is on the defendant. *Id.* at 757. In this case, the only medical evidence establishing that Webb was "disabled" by the back condition is Dr. Lee's chart entry of September 13, 2007, over two years after Hurricane Katrina. Defendant has failed to prove that plaintiff's back condition is an intervening cause of plaintiff's damages because the same damages would have occurred with or without Webb's back condition. See *Reynolds v. Alton & S. Ry.,* 115 Ill. App. 3d 88, 450 N.E2d 802 (1983) (finding evidence of heart attack occurring after elbow injury under suit was properly excluded as irrelevant). Because Webb's earning capacity was cut off by his psychiatric condition before Dr. Lee determined that his back condition was disabling, the same damage would have occurred irrespective of the back injury. The back injury therefore does not act as an intervening or superseding cause.

The Court has substantial discretion in awarding damages for PTSD. See *Farfaras v. Citizens Bank & Trust of Chi.*, 433 F.3d 558, 566-67 (7th Cir. 2006)

("Awards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive."). That discretion includes the right to consider results in similar cases. The reported cases reflect a broad range of verdicts for PTSD. See, e.g., *Ibanez v. Velasco*, No. 96 C 5990, , 2002 U.S. Dist. LEXIS 7364, at *25-35, 2002 WL 731778 (N.D. Ill. April 25, 2002) (upholding a $2.5 million jury award to a plaintiff whose physical injuries were "not severe" and who proffered only $5,737.33 in medical bills because of plaintiff's emotional injuries, including PTSD); *Schneider v. Nat'l R.R. Passenger Corp.*, 987 F.2d 132, 137-38 (2nd Cir. 1993) (finding jury verdict of $1.75 million awarded to railroad employee in FELA case, including approximately $1 million to compensate plaintiff for PTSD, depression and organic brain syndrome, was not excessive for physical injuries and PTSD); *Kukla v. Syfus Leasing Corp.*, 928 F. Supp. 1328, 1336-37 (S.D. N.Y. 1996) (upholding jury award of $1,350,000 for pain and suffering that was largely for PTSD); *Ill. Cent. R.R. Co. v. Gandy*, 750 So.2d 527, 533-35 (Miss. 1999) (affirming $750,000 award to train conductor who suffered from PTSD after train collision).

Because Dr. Smith explained that PTSD and major depression are *medical* conditions and not transitory mental states such as fright, fear, or "emotional distress," it is also appropriate to consider verdicts in cases involving pain and suffering for that is surely what PTSD and major depression are. See, e.g., *Frazier v. Norfolk & W. Ry. Co.*, 996 F.2d 922, 925-26 (7th Cir. 1993) (finding

that $2.3 million award not excessive for a plaintiff who did not require continued medical treatment or prescription pain medication for his back injury, and who could lift objects weighing under fifty pounds).

*Nielsen v. Northbank Towing, Inc.*, 768 So.2d 145 (La. Ct. App. 2000), affirmed an award of $350,000.00 to a claimant who spent ten minutes in the water before reaching a life raft, and two additional hours in the raft.  The court, without any analysis, held this figure was "neither abusively high nor abusively low."  *Id.* at 161

The case at bar presents not just the typical stressor of a natural disaster but also the compounding factor of David O'Neill ordering the crew to remain at Davant, Louisiana instead of evacuating.[8]  As discussed above, DSM-IV describes human design as one of the stressors that makes PTSD longer lasting.  (See Paragraph 109, *supra.*).  Although Webb was exposed to a natural disaster, this was because his boss required it.  This case therefore presents the human tormentor element present in rape and torture cases as well as the natural disaster feature.  Webb continues to receive regular treatment over six years after the event.  (Kathy Webb Deposition, p. 18).

Because of the unique nature of the life-threatening circumstances Webb had to endure, and testimony that indicates Webb's PTSD is severe and permanent, this Court finds that its award, is warranted by the evidence.

---

[8] By compounding the psychiatric effect of the exposure to the hurricane, the Court is not awarding punitive damages. See, e.g., *Kozar v. Chesapeake & Ohio Ry.,* 449 F.2d 1238, 1240 (6th Cir.1971); *Kopczynski v. Jacqueline,* 742 F.2d 555 (9th Cir. 1984), cert. denied, 471 U.S. 1136, 105 S.Ct. 2677, 86 L.Ed.2d 696 (1985).

g. **Dr. McGhee's charges for treatment in the past:**          $6932.75[9]

**Pharmacy Totals for Dr. McGhee's Prescriptions:**
**(Dover: 9382.90; Fred's: 1012.65)**                          $10,395.55
**Mileage For Seeing Dr McGhee:**
**2006:  6 visits@ $0.18 x 40 x 2**                             $86.40
**2007:  16 visits@ $0.20 x 40 x2**                             $256.00
**January - June 2008: 6 @ $0.19 x 40 x 2:**                    $91.20
**July - December 2008: 3 @ $0.27 x 40 x 2:**                   $64.80
**2009:  10 visits@ $0.24 x 40 x 2**                            $192.00
**2010:  7 visits@ $0.165 x 40 x 2**                            $92.40
**January - June 2011:  3 visits@$0.19 x 40 x 2**               $45.60
**July - October 2011: 3 visits @ $0.235 x 40 x 2**            $56.40

**TOTAL PAST MILEAGE REIMBURSEMENT:**                          $884.80

The mileage reimbursement rates are for medical mileage from the chart at
http://www.irs.gov/taxpros/article/0,,id=156624,00.html (last visited February 2, 2012).

The Court finds that Webb is likely to continue to see Dr. McGhee for at least the next four years at an average frequency of five visits per year with a per visit charge of $118.25.  Thereafter, it is likely that he will see Dr. McGhee twice a year for medication checks.  This is based on the fact that the frequency of Webb's visits has decreased with time and the fact that Webb indicates, subjectively, that he is getting better.  In addition, the Court finds that because IRS mileage rates fluctuate, an average rate based on the rates from 2006 to 2011 is appropriate. The Court has weighed full years as one and split year periods as one-half to arrive at an average mileage figure of $0.2455.   The total for future medical visits for the next four years is **$2,365.00**. The total for future medical visits from 2015 through 2035 is **$4,730.00**.   The total for future mileage for the next four years

[9] The figures used here were provided to the Court by plaintiff in his proposed findings of fact and conclusions of law.

is **$392.80**.  The total for future mileage thereafter is **$785.60**.  The Court finds

that on average, Webb's prescription charges for drugs prescribed by Dr. McGhee

are $2,079.11. The Court finds that Webb will continue to incur this cost, on

average, for the rest of his life and accordingly awards **$49,898.64** for future

prescription bills for psychiatric conditions caused by exposure to Hurricane

Katrina.  The total future medical expenses, prescription bills, and mileage is

$58,172.04. To calculate the present cash value of this total stream, the Court

uses the same ratio Dr. Grossman testified to for plaintiff's future wage loss, i.e.,

89.7%.[10]  Applying that number to the total future medical expenses, prescription

bills and mileage results in recoverable damages of **$52,180.32.**

h. Webb is entitled to prejudgment interest for his past damages of

**$1,115,913.10**.[11]  The Court hereby awards prejudgment interest at an annual

rate of 3.88% measured as of the date of accident August 29, 2005, and

commencing from the date of judicial demand, July 17, 2007.  The law is clear

that in Jones Act cases tried in admiralty, plaintiffs may be entitled to

prejudgment interest, even though such would not be the case in a jury trial.

See *Williams v. Reading & Bates Drilling Co.*, 750 F.2d 487, 491 (5th Cir.

1985) ("We hold, therefore, that when a Jones Act claim is brought under the

---

[10] Dr. Grossman discounted Webb's future earnings of $74,150 per year for a
13.9 year period from a gross total of $1,030,685 to $924,112 which yields an
after-discount percent of 0.897.
[11] This includes $45,000 for past physical pain from plaintiff's arthritis, $302,700
for past wage loss, $750,000 past pain an suffering caused by psychiatric
disorders, $6,932.75 for Dr. McGhee's past treatment, $10,395.55 for past
prescriptions, and $884.80 for past mileage reimbursement.

court's admiralty jurisdiction, and hence the case is tried to the court and not

to the jury, the allowance of prejudgment interest is within the discretion of the

trial court even if there is not a finding of unseaworthiness."); *Hillier v. S.*

*Towing Co.*, 740 F.2d 583, 584 n.2 (7th Cir. 1984) ("The general admiralty rule

favoring awards of prejudgment interest has also been expanded to wrongful

death claims and personal injury claims under the Death on the High Seas Act,

46 U.S.C. § 761 *et seq.*, and under the Jones Act, 46 U.S.C. § 688."); see also

*Benson v. Diamond Offshore Drilling, Inc.*, No. 00-591-JJB, 2011 U.S. Dist.

LEXIS 96171, at *27, 2011 WL 3794908, at *9 (M.D. La. Aug. 26, 2011)

("Pursuant to maritime law, the awarding of pre-judgment interest is the rule

rather than the exception, and, in practice, well-nigh automatic.[] This rule

applies equally to Jones Act claims brought under the Court's admiralty

jurisdiction.").

Prejudgment interest may be awarded for all past damages suffered by a

Jones Act plaintiff. See *Hillier*, 740 F.2d at 586. Prejudgment interest begins

accruing from the date of the accident. See *First Nat'l Bank of Chi. v. Material*

*Serv. Corp.*, 597 F.2d 1110, 1121 (7th Cir. 1979). One valid method for selecting

a rate is to apply the federal statutory rate for post-judgment interest (see 28

U.S.C. 1961) as it existed on the date of the accident. See *Benson*, 2011 U.S.

Dist. LEXIS 96171 at *28, 2011 WL 3794908 at *9 ("The court takes judicial

notice of the prevailing rate for January 6, 1998, about three weeks before the

January 27, 1998 accident, and finds that the most equitable rate of prejudgment

interest would be 5.341%.").  In this case, the subject accident occurred on August 29, 2005.  The statutory rate of interest as of the most recent date prior to that accident, August 26, 2005, was 3.88%.  *See*

http://www.utd.uscourts.gov/documents/int2005.html [last visited January 31, 2012].  Thus, the Court applies the statutory rate of 3.88% to the past damage award of $1,115,913.10,to begin running from July 17, 2007, for a current total of: **$201,066.14**.[12]

CONCLUSION

The Court hereby enters judgment in favor of plaintiff Tyree Webb and against defendant TECO Barge Line, Inc. in the total amount of **$4,293,271.56**.[13]

**IT IS SO ORDERED.**

**Signed this 7th day of March, 2012.**

David R. Herndon
2012.03.07 15:03:08
-06'00'

**Chief Judge**
**United States District Court**

---

[12]Plaintiff did not provide the Court with a formula for calculating prejudgment interest.  The Court has used the following formula to calculate prejudgment interest: (amount of past damages) x (prejudgment interest rate) / (365 days per year) x (number of days from the date of judicial demand to the date judgment is awarded) = prejudgment interest owing to date of judgment.  Here, the figures used were as follows: $1,115, 913.10 x .0388 / 365 x 1695 = $201,066.14.  The Court notes that it used the date of judicial demand rather than date of the accident because that is what plaintiff suggested in his proposed findings of fact and conclusions of law.

[13] This figure includes the following: $45,000 for past physical pain from plaintiff's arthritis, $924,112 in future wage loss, $302,700 for past wage loss, $750,000 for past pain an suffering caused by psychiatric disorders, $2,000,000 for future pain and suffering caused by psychiatric disorders, $6,932.75 for Dr. McGhee's past treatment, $10,395.55 for past prescriptions, $884.80 for past mileage reimbursement, $52,180.32 for future medical expenses, and $201,066.14 in prejudgment interest for past damages.